T.C. Memo. 2021-60

UNITED STATES TAX COURT

ESTATE OF CLARA M. MORRISSETTE,
DECEASED, KENNETH MORRISSETTE, DONALD J.
MORRISSETTE, AND JOHN D. MORRISSETTE, PERSONAL
REPRESENTATIVES, Petitioners v. COMMISSIONER
OF INTERNAL REVENUE, Respondent

Docket No. 4415-14.                    Filed May 13, 2021.

Kelley C. Miller and Mark W. Wasserman, for petitioners.

Randall L. Eager, Elizabeth C. Mourges, Robert J. Braxton, Rachel L. Rollins, Timothy B. Heavner, Ashley M. Bender, and Tammie A. Geier, for respondent.

[*2]     MEMORANDUM FINDINGS OF FACT AND OPINION

GOEKE, Judge:  Respondent issued a notice of deficiency determining an estate tax deficiency of approximately $39.4 million with respect to the Estate of Clara M. Morrissette (estate) in which he increased the fair market values of the decedent's contract rights in six split-dollar life insurance arrangements from $7,479,000 to $32,060,070, the cash surrender values of the underlying life insurance policies, among other adjustments that the parties have settled. Petitioners now argue that the contract rights had a fair market value of $10,452,000.  Respondent also determined an underpayment penalty of 40% for a gross valuation misstatement under section 6662(h) or, alternatively, of 20% for a substantial valuation understatement under section 6662(b)(5) and (g)(1) with respect to the decedent's rights in the split-dollar agreements.[1]

The parties agree that the property includible in the gross estate is the decedent's rights to payment under the split-dollar agreements (split-dollar rights). The issues for our consideration are:  (1) whether section 2036 or 2038 applies to recapture inter vivos transfers made as part of the split-dollar agreements and (2) if

[1]Unless otherwise indicated, all statutory references are to the Internal Revenue Code (Code), 26 U.S.C., in effect for the date of the decedent's death, and all Rule references are to the Tax Court Rules of Practice and Procedure. Dollar amounts are rounded.

[*3] not, we must determine the fair market values of the split-dollar rights including whether the special valuation rule of section 2703 applies to require that the valuation disregard a provision in the split-dollar agreements that restricts the parties' right to unilaterally terminate the agreements. We hold that sections 2036 and 2038 do not apply because the transfers that were made as part of the split-dollar agreements qualify for the bona fide sale exceptions of both sections. We further hold that the special valuation rules of section 2703(a) would not require the inclusion of the cash surrender values of the six life insurance policies in the gross estate on the basis of the terms of the split-dollar agreements and the section 2703(b) exception.

To determine the fair market values of the decedent's split-dollar rights, we adopt the discounted cashflow method of valuation including discount rates of respondent's expert to the extent stated herein. Finally, we hold that the estate is liable for a 40% penalty for a gross valuation misstatement.

## FINDINGS OF FACT

The decedent, Clara M. Morrissette, lived in Virginia at the time of her death on September 25, 2009. Personal representatives of the estate, Mrs. Morrissette's three sons, Arthur Jr., known as Buddy, Donald (Don), and Kenneth (Ken), lived in Virginia when the petition was timely filed.

[*4]   Mrs. Morrissette married Arthur E. Morrissette in 1933.  In 1943 Mr.

Morrissette bought a used truck for $450 and started a moving company.  Today

that moving company, Interstate Group Holdings, Inc. (Interstate), comprises 32

companies operating a moving, relocation, and storage business.[2]  At the time of

her death, Mrs. Morrissette owned the majority of the shares of Interstate as well

as substantial real estate holdings and a real estate management company through

various trusts.

A.     History of the Business

Mr. and Mrs. Morrissette had their sons working at Interstate in their teens

or before, beginning with doing odd jobs.  The brothers have worked for the

business most of their lives.  Mr. Morrissette was a strict boss even with his sons.

By all accounts he was a boss first and a father second.  The brothers often had a

contentious relationship with their father going back to their childhoods.

However, Mr. Morrissette wanted his sons to work in the business, to inherit it,

and to pass it on to their own children one day.

In the late 1980s Mr. Morrissette considered selling the business but

ultimately changed his mind realizing that he did not want to sell the company he

---

[2]In January 2009 Interstate was reorganized as an S corporation holding company with qualified S subsidiaries.  The reorganization is not relevant for purposes of this case.  We refer to the business as Interstate for all years discussed.

[*5] had founded and to which he had devoted his life. At that time, the brothers were in their mid-to-late forties and were executives at Interstate. Buddy was Interstate's CEO and president and was the driving force behind Interstate's expansion beginning in the 1980s and continuing throughout the 1990s and early 2000s.

After learning of their father's decision Ken and Don told their father that they wanted to leave the business. Mr. Morrissette offered to buy out their stock at the price he had negotiated for the sale. Ken and Don believed the buyout would be amicable. However, for Mr. Morrissette it was not. He viewed Ken and Don as disloyal. In Ken's and Don's opinion, Mr. Morrissette and Buddy unfairly lowered the stock price for the buyout, cut them off financially in other ways, and caused them financial hardship by making them repay corporate loans. Mr. Morrissette engaged an attorney and made Ken and Don sign noncompete agreements. Eventually, Ken and Don sued their father and won, causing further animosity. Even before the buyout, there was discord between Mr. Morrissette and his sons and among the brothers.

After years of tension over the buyout, in 1995 Mrs. Morrissette persuaded her husband to forgive Ken and Don and invite them back into the business. Mr. Morrissette reinstated them into executive positions, paid them the same salary as

[*6] Buddy, and gave them nonvoting Interstate stock but not voting stock. Only Mr. and Mrs. Morrissette and Buddy held voting stock. Buddy felt cheated by his father's decision to accept his brothers back into the business. He resented his brothers and felt that he did not receive any recognition for his loyalty. Disagreements among the three brothers were pervasive and caused difficulties for Interstate's staff.

Together Mr. and Mrs. Morrissette implemented an estate plan for Interstate's ownership which Mrs. Morrissette later revised in 1996 after her husband's death (1996 plan), described below. They were adamant that Interstate remain in the family, and they wanted to exclude anyone who was not their own blood, including spouses, stepchildren, and adopted children, from inheriting stock. They had consistently expressed their wish that their sons and grandchildren retain ownership of Interstate. In fact, Mrs. Morrissette wanted Interstate to remain a family business for future generations. The brothers shared the same wish, that their children would inherit the company, and wanted to encourage them to work at Interstate. Buddy's sons, Bud and J.D., shared this hope for their children one day. However, some brothers and grandchildren had adopted children or stepchildren, and they wanted to be able to leave their stock to them. The brothers also wanted to establish marital trusts with the stock.

[*7] B.        1996 Succession Plan

In August 1994 Mrs. Morrissette settled a revocable trust, the Clara M. Morrissette Trust (CMM trust), to hold her Interstate stock. The trust agreement named Mrs. Morrissette as the initial trustee and the brothers as successor cotrustees. In April 1995, after welcoming Ken and Don back into Interstate, Mr. Morrissette settled a revocable trust, Arthur E. Morrissette Trust (AEM trust), to hold all of his Interstate stock. At that time Mr. and Mrs. Morrissette owned approximately 82% of Interstate's voting stock and 73% of its nonvoting stock.[3] The trust agreements provided that the stock would be held in trust throughout the lives of all three sons. The AEM and CMM trusts also held real estate and marketable securities. Mr. Morrissette died in April 1996, and Mrs. Morrissette revised the plan.

Upon Mr. Morrissette's death, the AEM trust distributed its assets to three trusts for the benefit of Mrs. Morrissette (collectively AEM trusts). Two trusts held Interstate stock, one for voting stock and the second for nonvoting stock, and the third trust held real estate and other assets. The AEM and CMM trust

---

[3]All of Mr. and Mrs. Morrissette's Interstate stock was thereafter held in the revocable trusts. For convenience, we refer to them individually as owning Interstate stock. Likewise, for convenience, we refer to the brothers' ownership through the subtrusts as stock owned by the brothers.

[*8] agreements stated Mr. and Mrs. Morrissette's shared intent that after their deaths their sons would own equal shares of voting stock and this equality would continue to the Morrissette grandchildren's generation. Upon the death of the last parent to die, the AEM trusts would distribute their assets to a subtrust for each son (AEM subtrusts), and upon the deaths of the first two sons to die, the sons' AEM subtrusts would distribute their assets equally to subtrusts for the biological children (AEM grandchildren subtrusts). Adopted and step children were excluded in accordance with Mr. and Mrs. Morrissette's wishes.

After the death of the last brother to die, that brother's AEM subtrust and the AEM grandchildren subtrusts would terminate and distribute their assets to the biological grandchildren per stirpes. Once the AEM subtrusts distributed the stock to the grandchildren, the grandchildren could sell the stock to anyone, and the family could lose control of the business. Mr. and Mrs. Morrissette wanted Interstate to remain a family business for many generations although the 1996 plan ensured it would remain as such only through their grandchildren's generation.

When Mr. and Mrs. Morrissette settled their revocable trusts, Buddy was the only brother who owned Interstate voting stock; he owned 15.5% of the voting stock. Mr. and Mrs. Morrissette wanted their sons to have equal voting rights after their deaths. To equalize the voting stock, the 1996 plan provided for unequal

[*9] distribution of the AEM and CMM trusts' voting stock among the brothers' AEM subtrusts. Thus, Buddy would inherit less voting stock than Ken and Don. After the distribution, each brother would own an equal number of voting shares.

Mr. and Mrs. Morrissette wanted to compensate Buddy for this unequal treatment by giving him a greater share of Interstate's nonvoting stock. Thus, the AEM and CMM trusts would distribute more nonvoting stock to Buddy's AEM subtrust than his brothers' to make up for the unequal distribution of the voting stock. Each brother's AEM subtrust would receive the same total shares when counting both voting and nonvoting stock, but after the distributions Buddy would own more total stock. The voting and nonvoting stock are identical except for voting rights.

Under the 1996 plan, Interstate stock and other assets held in the AEM and CMM trusts would have been includible in Mrs. Morrissette's gross estate upon her death. In addition, most Interstate stock would have been includible in the brothers' gross estates when they died because the brothers had testamentary general powers of appointment over the assets in their AEM subtrusts.

The brothers had tense, difficult relationships stemming from Don's and Ken's buyouts, the lawsuit that followed, and the betrayal that Buddy felt when their father welcomed Don and Ken back into the business. The 1996 plan

[*10] exacerbated the controversies among the brothers. Buddy was upset after the stock distribution under the 1996 plan. Even though he would own more total shares, he felt cheated and felt that he deserved to receive at least the same number of voting shares as his brothers or possibly more because he was the only son who had been loyal to the business and the family.

Mr. and Mrs. Morrissette knew that it was not easy for their sons to work together. However, they wanted Interstate to remain a family business and wanted their sons to work together, and the brothers knew that this was their parents' wish. Mr. and Mrs. Morrissette tried to stop the continued animosity among the brothers by adding a fourth independent trustee as part of the 1996 plan, referred to as the fourth brother provision. Under the fourth brother provision, whenever two brothers disagreed with the third over a business matter, the matter was to be referred to the independent trustee with the understanding that the independent trustee would side with the brother in the minority unless the majority's position was compelling. Accordingly, the brothers would need to make unanimous decisions on business matters or there would likely be a deadlock that prevented any matter from going forward. According to the trust documents, the role of the fourth trustee was to prevent two brothers from acting against the interests of the third brother in Interstate's management. However, the fourth brother provision

**[\*11]** evolved into a veto culture where each brother felt entitled to reject his brothers' business proposals.

After her husband's death Mrs. Morrissette worried that the disagreements among her sons would lead to another lawsuit. Nevertheless, she insisted that Interstate remain a family business and the brothers work out their differences. She never wavered from her desire that her sons inherit Interstate equally and that each son's shares pass to his biological children. At that time Buddy was Interstate's president and chief executive officer (CEO). Don was the president of a family real estate management company, AEM, Inc., and managed Interstate's trucks and facilities. Ken was Interstate's chief accounting officer and also managed its legal matters.

Mrs. Morrissette had good reason to be concerned. By 2000 the brothers' relationship deteriorated to the point where they could not discuss business matters in person for longer than a hallway chat. Each brother felt that his brothers did not respect his area of expertise. The brothers fought over whether they worked hard enough and accused each other of not stepping up to handle enough responsibilities. They refused to take direction or suggestions from each other. Don and Ken's relationship had grown so strained that they could not speak to each other about work matters and communicated through memoranda and

[*12] email even though they had adjacent offices. The brothers wanted Interstate to be successful and to remain in the family, but they were able to act only on the most important matters and argued almost daily about how they were doing their jobs.

Buddy did not want to get involved in the growing animosity between Ken and Don. But Buddy also caused discord. He made major decisions and changes to company policy without his brothers' input. By 2002 Don and Ken as well as Buddy's sons, Bud and J.D., wanted Buddy to step down. They felt that Buddy had become less engaged in Interstate's business and his decisions were negatively affecting the work environment and employee morale. Ken and Don thought that Buddy had caused Interstate to lose drivers and agency relationships. They also realized that the brothers' difficult relationship caused problems for the staff.

Apart from the need to resolve conflict in the brothers' relationships, Interstate needed a plan to transition management to the next generation. Two of Buddy's sons, Bud and J.D., who were in their mid-forties and Interstate executives, wanted more responsibility and autonomy. They had dedicated their careers to Interstate, having worked there for over 25 years, beginning as teenagers, then during college, and later as executives. Buddy, Don, and Ken were in their mid-to-late sixties and continued to work full time. Bud and J.D. wanted a

**[\*13]** formal plan and timeframe for the transition of management to them. They understood that Bud was being groomed to become CEO, and J.D. was in charge of one of Interstate's most successful divisions. They had tried to talk about their concerns with Buddy, but he was dismissive. In 2005, J.D. considered leaving Interstate and expressed this in a letter to Buddy.

Bud and J.D. did not find it easy to work with their father. They felt that Buddy was not receptive to their ideas or opinions and they could not disagree with Buddy at work. They felt that Buddy put business before his family just like their grandfather. More importantly, Bud and J.D. thought that Interstate lacked long-term business planning. They were concerned about their futures and were concerned that the 1996 plan would not ensure a continued viable business, a stable transition of Interstate's management to them, or retention of family ownership of Interstate.

The tension among the brothers created by the 1996 plan was not the only problem. There was no definite plan on how to pay estate tax after Mrs. Morrissette's death, and there was a concern that the estate would need to sell real estate and Interstate stock. The brothers had a vague plan to pay the estate tax from Interstate's profits over a 10-year period after their mother's death. They believed that the estate would qualify for a payment deferral under section 6166

[*14] that they understood would allow payment of estate tax over 10 years upon the death of a shareholder of a family-owned business. There were two key problems with this plan. First, the brothers ignored warnings from Interstate's accountant that the estate would not qualify for the 10-year deferred payment because Mrs. Morrissette held substantial passive investments in real estate. Buddy, in particular, was dismissive of the accountant's concerns.

Second, Don, Bud, and J.D. were concerned that paying the estate tax with Interstate's profits could adversely affect the business. In particular, they were concerned that such a use of Interstate's profits would jeopardize its Government contracts, which accounted for approximately 70% of its business, because withdrawing the profits could cause Interstate to fail the financial requirements for the award of Government contracts. They were also concerned that Interstate would not generate sufficient profits to pay estate tax from its annual profits and the estate would need to sell Interstate stock or other assets to pay the estate tax. No one performed an analysis of whether the profits would be sufficient to pay the estate tax. The accountant advised the brothers that the estate might need to sell assets to pay estate tax. Most of Mrs. Morrissette's assets were illiquid including Interstate stock and real estate. The brothers did not want to sell Interstate stock to a third party.

[*15] Bud and J.D. were concerned that the plan to pay estate tax with Interstate's profits would jeopardize the company's future or force a sale to third parties. They were concerned about what this could mean for their careers. In fact, Interstate's net income significantly declined in the years after Mrs. Morrissette's death and might not have been sufficient to pay estate tax during the 10 years for deferred payment that the brothers assumed would be available to the estate.

C.    2006 Estate Planning

In November 2005 Mrs. Morrissette was diagnosed with Alzheimer's disease and dementia.[4]  She had good and bad days, but she was physically strong and healthy.  Don visited her daily.  Some days she was talkative, others not. Before her diagnosis, Don had taken Mrs. Morrissette to inspect the real properties, and she continued to give her input on the business.

In early spring 2006 Bud met Alan Meltzer, an insurance broker, at a fundraising dinner for his alma mater.  Mr. Meltzer inquired about Interstate's life insurance needs and the purchase of life insurance as part of estate planning and

---

[4]The parties dispute when the brothers became successor cotrustees of the CMM trust but agree that Mrs. Morrissette was incapacitated as of November 2005.  Petitioners assert that date.  Respondent asks us to disregard the incapacitation and adhere to a purported stipulation that the brothers "became" cotrustees in September 2006.  Petitioners disagree with this reading of the stipulation.  We do not resolve this dispute because the brothers' status as cotrustees is immaterial to our decision.

[*16] asked to set up a meeting. At that time, Bud did not understand his grandparents' trusts or did not know the value of Mrs. Morrissette's estate. He indicated to Mr. Meltzer that insurance needs were not within his responsibilities at Interstate but expressed his concern with estate and succession planning and agreed to introduce Mr. Meltzer to Buddy.

Approximately two months later, Bud introduced Mr. Meltzer to Buddy and then at a second meeting to Ken, Don, and J.D. At the second meeting Mr. Meltzer introduced the five family members to Jim McNair, a tax and estate planning attorney. Mr. Meltzer and Mr. McNair have worked together on estate planning strategies since the 1980s. Neither Mr. Meltzer nor Mr. McNair met Mrs. Morrissette. At the second meeting, the family members discussed Interstate's business and Mr. and Mrs. Morrissette's desire for Interstate to remain in the family. They disclosed the history of the business including Ken's and Don's buyouts, the subsequent lawsuit, and Buddy's feeling of unfair treatment when Ken and Don returned to the business and under the 1996 plan. They also discussed the transition of Interstate's management to Bud and J.D. They explained that they planned to pay the estate tax owed on Mrs. Morrissette's death with Interstate's profits over 10 years under the payment deferral. Ken provided

[*17] financial statements for the CMM and AEM trusts, Mrs. Morrissette, and Interstate.

Mr. McNair advised that the estate would not likely qualify for a payment deferral under the 1996 plan because of Mrs. Morrissette's real estate holdings and would likely have to pay the estate tax in full within nine months of her death. He advised that the AEM and CMM trusts should restructure their real estate holdings to qualify for the deferral. He presented estate tax saving strategies including the purchase of life insurance through split-dollar arrangements. However, the implications of tax strategies were not discussed in detail. He provided marketing materials prepared by his firm's marketing department that included information on split-dollar agreements. The marketing materials included an example of a grandmother who pays a $10 million life insurance premium as part of a split-dollar life insurance agreement in exchange for rights determined on the basis of the policy's cash value. The marketing materials suggested that the estate could report the value of the grandmother's rights under the split-dollar agreement for estate tax purposes at $565,000 or $1,445,000, a substantial discount from the $10 million premium.

The brothers asked Mr. McNair to prepare a schedule comparing the estate tax under the 1996 plan and the proposals discussed at the meeting including the

[*18] restructure of the real estate holdings and the split-dollar agreements. The next day Buddy emailed the meeting attendees that he was unwilling to discuss estate planning any further because of past family tensions. However, Buddy's brothers and sons wanted to pursue a new estate plan. They recognized the problems with the 1996 plan, the effect on Interstate if the estate did not qualify for a payment deferral, and the need to ensure a smooth transition of Interstate's management to the next generation.

Both Mr. Meltzer and Mr. McNair replied to Buddy's email by emphasizing the potential estate tax saving as an incentive to engage their services. Mr. Meltzer replied that a new plan would benefit all family members equally and reduce estate tax by $20 to $30 million. Mr. McNair replied that the estate could save $21.9 million: $9.4 million with the split-dollar arrangements, $10.9 million by restructuring real estate holdings, and $1.6 million by reorganizing other partnership interests. He also advised that the estate could qualify for a payment deferral on $14.5 million of the estimated estate tax owed with respect to Mrs. Morrissette's real estate holdings under his proposals but would need to pay the remaining $25.3 million in estate tax that he projected as owed within nine months of Mrs. Morrissette's death.

[*19] Over the course of the next week, the brothers decided to proceed with a new estate plan (2006 plan) that included a buy-sell provision for each brother's Interstate stock on his death, the purchase of life insurance on each other's lives to finance the buyouts with a portion of the death benefits with the CMM trust paying the life insurance premiums under split-dollar agreements, and the CMM trust's settlement of a dynasty trust for each brother to own the policies. The 2006 plan also restructured the real estate holdings of the CMM and AEM trusts so that the estate would qualify for a partial payment deferral of estate tax.

The brothers wanted their children to work at Interstate but also recognized that their children might not want to. They wanted to provide their children with a means to cash out while avoiding the problems of the past. The buy-sell provision ensured that the brothers could retain ownership of Interstate during their lifetimes and provide for a successful transition of Interstate's management to the grandchildren who wanted to continue ownership. The 2006 plan also protected against the need to use Interstate profits or to sell Interstate to third parties to pay estate tax on Mrs. Morrissette's death or the brothers' deaths.

**[\*20]** 1.    Conservatorship

The brothers decided to seek the creation of a temporary limited conservatorship for Mrs. Morrissette to implement the 2006 plan. They understood that they had the authority to execute the 2006 plan without obtaining a court-appointed conservator because they served as cotrustees of the CMM trust and held a power of attorney for Mrs. Morrissette. However, they sought a conservatorship because they understood a conservatorship would make it more difficult for anyone of them to later challenge the 2006 plan. Quite simply, the brothers did not trust each other.

On August 18, 2006, the county circuit court declared Mrs. Morrissette permanently incapacitated and appointed a temporary limited conservator. The petition for the conservator's appointment stated that the CMM trust sought the conservatorship to complete actions as part of the 2006 plan and acknowledged the estate tax saving purpose in accordance with State law requirements for a conservator's appointment. A court-appointed guardian ad litem found that Mrs. Morrissette required 24-hour supportive care and appeared incapable of making decisions regarding complicated issues or managing her financial affairs. He described Mrs. Morrissette as unresponsive and confused at times and indicated that she did not appear to understand all of the rights he read to her. Mrs.

[*21] Morrissette expressed no objection to the appointment of a conservator and indicated that she did not want to attend the conservatorship court proceeding.

Ken asked a longtime Interstate employee who assisted the Morrissette family with both personal and business matters to serve as the conservator. The employee also had a close relationship with Mrs. Morrissette and knew that she wanted her sons to inherit Interstate equally and wanted her grandchildren to inherit Interstate one day. The conservator thought that the actions she took as the conservator were in Mrs. Morrissette's best interests and in accordance with her wishes. However, no one explained the split-dollar agreements to the conservator.

We refer to the CMM trust and Mrs. Morrissette interchangeably herein, as the parties agree that the trust was revocable and the assets in the trust were includible in Mrs. Morrissette's gross estate. At all relevant times, the brothers were cotrustees of the CMM trust. They had been directing Mrs. Morrissette's financial affairs before the decision to execute the 2006 plan and the appointment of the conservator.

2.    Dynasty Trusts

On September 15, 2006, the CMM trust established a perpetual dynasty trust for the benefit of each son (dynasty trust) with an initial contribution of $10,000. Each son was cotrustee of his respective dynasty trust along with

[*22] Interstate's chief financial officer, whose only function was to sign documents and who was not asked to exercise any independent judgment as cotrustee. The trust agreements authorized the dynasty trusts to purchase life insurance on the lives of the brothers, required that the dynasty trusts be the owners of the policies, and provided a sharing arrangement that required the dynasty trusts to distribute one-third of the death benefits, less the amount paid for the deceased brother's stock under the buy-sell provision, to the other two dynasty trusts. The agreements stated Mrs. Morrissette's intent to contribute sufficient amounts to the dynasty trusts to pay the policy premiums and also authorized the dynasty trusts to enter into split-dollar or premium sharing agreements with any appropriate person.

### 3. Amendments to the CMM Trust Agreement

On September 19, 2006, the CMM trust agreement was amended to authorize the trustees to engage in transactions related to the implementation of the 2006 plan including paying premiums on the life insurance policies acquired to fund the buy-sell provision, making loans, entering into the split-dollar agreements, or making other arrangements to assist Interstate's shareholders with funding their obligations under Interstate's business succession plan. The CMM trust agreement was also amended to allow the trustees, in their sole and absolute

[*23] discretion, to distribute the CMM trust's split-dollar rights upon Mrs. Morrissette's death to each dynasty trust that was the counterparty to the agreements equal to one-third of Mrs. Morrissette's unused generation-skipping transfer tax exemption and to transfer the remainder of the split-dollar rights to such dynasty trust, the son, or his children.

    4.    <u>Shareholders Agreement</u>

On September 21, 2006, the AEM trusts and subtrusts, the CMM trust, the brothers, and the dynasty trusts executed a shareholders agreement that imposed restrictions on the transfer of Interstate stock and established a buy-sell provision upon the death of a brother. Under the buy-sell provision, upon a brother's death, the surviving brothers were obligated to use their best efforts to negotiate for the purchase of the deceased brother's stock. There was no obligation for the shareholders to purchase a deceased brother's stock if acceptable terms could not be reached. The shareholders agreement also required shareholders to provide a right of first offer for their shares. As part of the shareholders agreement, each brother consented to the purchase of a life insurance policy on his own life by his brothers' dynasty trusts.

The shareholders agreement imposed a number of restrictions on each shareholder's actions unless the other shareholders consented. These restrictions

**[\*24]** were intended to minimize further disputes among the brothers. Many of these restrictions were unrelated to Interstate's ownership, including restrictions on encumbering the shareholder's own property, guaranteeing or indemnifying debt, beginning legal proceedings, and amending a shareholder's constitutional documents.

The brothers hoped that the shareholders agreement would reduce the likelihood of further disputes over Interstate's management, prevent the sale of Interstate stock to third parties, and ensure that the brothers or their children would continue to own Interstate. They believed that the agreement furthered their parents' intent for Interstate to remain a viable family-owned business. They realized that the plan was inconsistent with Mr. and Mrs. Morrissette's wishes that their grandchildren would inherit Interstate one day, but the brothers' greater fear was the family's losing control of the business. The brothers tried to balance their parents' wishes against concern that the payment of estate tax would jeopardize Interstate's future or would force the brothers or the next generation to sell off a portion of Interstate.

The brothers made other changes as part of the 2006 plan and afterwards that were contrary to their parents' wishes including allowing spouses and adopted children to inherit Interstate stock. The brothers wanted to protect their own

**[\*25]** families' financial security after their deaths. They believed that the 2006 plan provided a way for Interstate to stay in the family for generations.

Mr. Meltzer and Mr. McNair did not introduce the idea of a buy-sell provision to the brothers. Ken had been urging his brothers to implement one beginning in 2002 because he was concerned that there would not be sufficient liquidity within the company to pay his mother's, his own, or his brothers' estate tax. He believed that a buy-sell provision would ensure that Interstate would remain in the family or at least allow for continued ownership by those who wanted to work at Interstate.

The 2006 plan provided Bud and J.D. with the assurances they wanted for their futures at Interstate. Ken, Don, Bud, and J.D. believed that Bud's meeting Mr. Meltzer was a catalyst to start a discussion about Interstate's future that they had avoided for years despite the fact that they knew that they needed to revise the 1996 plan. The family members also hoped that the 2006 plan would encourage other family members to enter the business.

5.    Life Insurance Policies

On October 4, 2006, each brother's dynasty trust purchased two flexible-premium, adjustable life insurance policies, a type of universal life insurance, one on the life of each of his two brothers, e.g., Buddy's trust purchased policies on

[*26] Don's life and Ken's life. For policies insuring Don's life, the dynasty trusts purchased policies from American General Life Insurance Co. (American General), and for Buddy's and Ken's lives, from Massachusetts Mutual Life Insurance Co. (MassMutual). The policies had initial death benefits of $1 million with total premiums of $10,000 for the MassMutual policies and $30,000 for the American General policies. On October 3, 2006, the CMM trust issued six checks to pay these premiums in full.

Each policy included a rider for additional death benefits of $8.73 million. Upon exercise of the riders, the total death benefits from each policy would be $9.73 million. Exercise of the rider would require additional premiums of approximately $5 million per policy, for total premiums of approximately $30 million and total death benefits of $58.2 million for the six policies. The dynasty trusts exercised the riders, but the record is unclear as to when they did so.

Flexible-premium, adjustable life insurance policies are typically more expensive than other types of life insurance. Mr. Meltzer described the policies to the brothers as a combination of whole and term insurance but stated that most was term insurance, which they purchased to lower Mr. Meltzer's commission. Under the terms of the policies, after the initial premium had been paid, there was no requirement that any specific amount be paid on any specific date. Subject to

[*27] certain limits stated in each policy, any additional amount could be paid on any date during the insured's lifetime. The premium payments were credited to the policy's cash value, i.e., the increase in the policy's cash value. As a result of the flexible-payment feature, the policyholders could increase or decrease the amounts of the policies' cash values.

Under the terms of the policies, the insurance companies charged a monthly administrative fee (monthly fee) that was deducted from the paid premiums, and the portion of the paid premiums not so used increased the policy's cash value. The cash values of the MassMutual and American General policies earned interest at rates determined by the insurance companies with a minimum annual interest rate of 3%. Under the terms of each policy, the policy's cash value less a fee charged by the insurance company for the surrender of the policy was the policy's cash surrender value.

The monthly fee included administrative expenses, mortality charges, and other associated expenses. Mortality charges are the cost of insuring the life of the insured and depend on the policy's cash value and the amount of the death benefit. In general, for two policies with the same cash value, a policy with a higher death benefit would have a higher monthly fee and thus a lower return measured by the annual appreciation in the cash value, i.e., inside buildup; conversely, a policy

**[\*28]** with a lower death benefit would have a lower monthly fee and a higher rate of inside buildup. If the policy's cash value cannot cover the monthly fee, the policy may terminate after two months but may be reinstated by the policyholder.

The monthly fee is different from the cost of current life insurance protection (cost of current protection), a concept used for purposes of the economic benefit regime under section 1.61-22, Income Tax Regs. (split-dollar regulations). The cost of current protection is used to determine the amount of the deemed annual gift. It is determined by rules set forth in the split-dollar regulations and is not based on the insurance company's monthly fee with respect to the policy at issue. See id. para. (d)(3) (calculating the cost of current protection by multiplying the life insurance premium factor published by the Internal Revenue Service (IRS) by the excess of the death benefit over the payment owed to the donor). On the basis of the MassMutual and American General policy documents, the cash surrender value may include amounts that were previously treated as deemed gifts under the economic benefit regime.

The dynasty trusts purchased policies with relatively high cash surrender values and low-to-modest death benefits. Ken, who made most decisions about which policies to purchase, wanted to purchase policies with high initial cash surrender values to ensure the CMM trust would receive adequate returns on the

[*29] premiums it paid from the outset. He also wanted sufficient death benefits to purchase the brothers' stock. He believed that $10 million in death benefits per policy would be sufficient to achieve both purposes. He estimated that the AEM and CMM trusts owned stock worth approximately $26.3 million at that time, which would likely increase to approximately $30 million during the brothers' lifetimes.

Finally, Ken considered the amount of liquid assets available to the CMM trust to pay the premiums. The CMM trust had access to approximately $26 million in liquid assets, earning an average rate of return of 2.95%, that could be used to pay the premiums. The brothers chose policies that earned interest at a minimum interest rate higher than 2.95%. The brothers also understood that the policies provided an advantage over the trust's existing investments because the death benefits would be tax exempt to the CMM trust. Mr. Meltzer believed that the policies were conservative. He earned $1 million in commission on the policies.

To fund the premiums, the AEM trusts distributed $8 million to the CMM trust and the CMM trust liquidated $18.25 million from an investment account. On November 2, 2006, the CMM trust took an advance distribution from Interstate of $4 million which Interstate accounted for as a loan from a subsidiary, Interstate

[*30] Van Lines (Van Lines loan). The CMM trust executed a promissory note and provided collateral for a three-year term loan with interest of 4.89% payable annually and principal due at maturity.

Ken wanted to prepay the premiums to ensure the policies would remain in effect. He worried that otherwise his brothers would refuse to pay the premiums as leverage in a business negotiation and jeopardize the 2006 plan. When the split-dollar agreements were executed, the brothers' life expectancies ranged from 14.6 to 18.6 years. The dynasty trusts were the named owners of the policies, and the policies were the dynasty trusts' only assets. In 2009 the insurance policies earned annual interest between 4.75% and 5.4%.

6.    Split-Dollar Agreements

On October 31, 2006, the CMM trust entered into two split-dollar agreements with each dynasty trust under which it agreed to contribute to the dynasty trust an amount necessary to pay the premiums associated with the riders on the two life insurance policies held by the dynasty trust. On that date, the CMM trust also paid in full the premiums owed for the riders. The premiums were $4.97 million for each American General policy and $4.99 million for each MassMutual policy. The amounts of prepaid premiums complied with the Code

[*31] and did not cause the policies to exceed the limits established by the Code for the amount of an investment in a life insurance policy. See sec. 7702A(b).

Recitals to the split-dollar agreements stated that their purpose was to provide funds to purchase a deceased brother's Interstate stock pursuant to the buy-sell provision. Under the split-dollar agreements, in return for contributing the premiums, the CMM trust was entitled to receive the greater of the amount of premiums it paid or the cash surrender value of the life insurance policy upon the insured's death or the termination of a split-dollar agreement, i.e., the payout event. We refer to the CMM trust's rights to such payment as the split-dollar rights and the date that the split-dollar agreements were executed as the transfer date. Upon an insured's death, the dynasty trust owning the policy would receive the death benefit less the amount owed to the CMM trust under the split-dollar agreement (net death benefit). Upon a termination of the split-dollar agreements, the dynasty trust would receive nothing.

The two primary differences between the payout events were the amounts that the dynasty trusts would receive and the method of the payment to the CMM trust. On the insured's death, the CMM trust had the right to receive its portion of the death benefits directly from the insurer. The split-dollar agreements provided: "The balance of the death benefit * * * , if any, shall be paid directly to the

[*32] [dynasty] Trust. No amount shall be paid from the death benefit * * * to the [dynasty] Trust until the full amount due to the [CMM trust] * * * has been paid. The parties hereto agree that the beneficiary designations of the Policy shall conform to the provisions hereof." The split-dollar agreements were provided to the insurance companies, but designation forms were not completed.

Upon a termination of the split-dollar agreements, the CMM trust did not have a right to direct payment from the insurance company. Rather, the CMM trust would receive payment from the dynasty trust. Only the dynasty trust had the right to cancel the policies and receive the cash surrender value. If a dynasty trust canceled a policy, the insurance company would pay the cash surrender value to the dynasty trust.

The split-dollar agreements imposed restrictions on the dynasty trusts' payment obligations to the CMM trust. Their payment obligations were limited to the policies' cash surrender values. Each split-dollar agreement provided that the dynasty trust was the sole and absolute owner of the policy and caused exercise ownership rights under the policy except to the extent limited by the split-dollar agreement. According to the split-dollar agreements, the agreements did not confer any rights of ownership in the policies on the CMM trust. Rather, the

**[*33]** CMM trust's sole right under each split-dollar agreement was the right to repayment as defined by the split-dollar agreements.

The split-dollar agreements provided that repayment to the CMM trust was to be made "solely" from the cash surrender values or the policy's death benefit depending on the payout event. However, a termination of the split-dollar agreements would not force cancellation of the underlying policies. The split-dollar agreements did not contain any option, agreement, or other right that granted a right to acquire or use the CMM trust's split-dollar rights to another person or any restriction on the CMM trust's right to sell or use the split-dollar rights.

The dynasty trusts collaterally assigned the policies to the CMM trust. The collateral assignments were filed with the insurance companies. The assignments did not confer on the CMM trust the right to borrow against the policies or cancel them, or any other ownership rights in the policies.

### a. Mutual Termination Right

The parties to the split-dollar agreements could terminate them by mutual assent (mutual termination right or mutual termination restriction). The split-dollar agreements did not provide that their termination would force cancellation of the policies. The split-dollar agreements expressly prohibited the

[*34] CMM trust from canceling or surrendering the policies. The agreements stated: "In no event shall the Donor [the CMM trust] have any right to cancel or surrender the Policy". Rather, the terms of the split-dollar agreements conferred on the dynasty trusts the sole right to cancel the policies and provided that the dynasty trusts could do so without the consent of the CMM trust or the insured. The split-dollar agreements provided that if the dynasty trusts were to cancel the policy, the split-dollar agreement would terminate. Thus, the dynasty trusts could force termination of the split-dollar agreements without the consent of the CMM trust by canceling the policies subject to their contractual obligations under the split-dollar agreements.

The split-dollar agreements also provided for termination on the bankruptcy, receivership, or dissolution of either party. They prohibited the CMM trust from "tak[ing] any other action which would impair or defeat the rights of the [dynasty] Trust in and to the Policy." There were no similar restrictions on the dynasty trust's rights in the policies.

Mr. McNair reviewed all legal documents that his law firm prepared for the family with respect to the 2006 plan but did not provide an opinion letter on the tax implications of the split-dollar agreements.

**[\*35]**       b.       <u>Gift Tax Reporting of Split-Dollar Agreements</u>

Mrs. Morrissette reported the payment of the premiums as gifts to her sons for gift tax purposes to the extent required by the economic benefit regime of section 1.61-22, Income Tax Regs., which treats the premiums as annual gifts equal to the annual cost of current protection. From 2006 to 2008 the total cost of current protection, i.e., the economic benefit, was $1,443,526. During those years, the brothers had the dynasty trusts pay premiums to reduce the amount of the taxable gifts from Mrs. Morrissette. The dynasty trusts paid premiums of $806,869. The source of these funds is not clear from the record. For 2006 to 2008 Mrs. Morrissette reported the difference between the costs of current protection and the dynasty trusts' payments, $636,657, as gifts.

The record does not indicate the portion of the cash surrender values attributable to the reported gifts. The dynasty trust's premium payments increased the policies' cash surrender values, but the amounts of the increases are not clear from the record. The split-dollar agreements did not obligate the dynasty trusts to pay any premiums and were silent as to how any such payments would affect the split-dollar rights or the dynasty trusts' rights to the corresponding increases in the cash surrender values.

**[*36]** Respondent challenged the gift tax treatment of the split-dollar agreements, arguing that they did not qualify for the economic benefit regime and Mrs. Morrissette made gifts of $29.9 million in 2006 when the CMM trust paid the premiums. In Estate of Morrissette v. Commissioner, 146 T.C. 171 (2016), we held that the split-dollar agreements complied with the economic benefit regime and Mrs. Morrissette did not make taxable gifts of the premiums in 2006 and made annual gifts only of the cost of current protection for gift tax purposes. We further held that although the dynasty trusts were the named owners of the policies in the policy documents, the CMM trust was the deemed owner for gift tax purposes under the economic benefit regime. We held that the dynasty trusts did not have current access to the cash surrender values for any years before Mrs. Morrissette's death, defined as a current or future right to the cash surrender values. Id. at 182, 186.

7. Restructuring of Real Estate Holdings

As part of the 2006 plan, the CMM trust restructured its real estate holdings and began to use AEM, Inc., to manage the properties so that the estate could qualify for the section 6616 payment deferral for a portion of the estate tax. The CMM trust contributed each property to a newly formed limited liability company (LLC) that was owned by the CMM trust and the brothers. The operating

[*37] agreement for each LLC required majority approval of the brothers, as the LLC's managing members, for operating decisions such as repairs and maintenance and unanimous approval for major decisions such as a sale of the property or financing matters. If the brothers could not agree on a major decision, any brother could declare the decision a deadlock. Three deadlocks would trigger a buy-sell provision for the sale of member interests to the other members. Without the restructuring, the brothers would have inherited the real estate as tenants-in-common. The brothers believed that the restructuring provided a more workable management structure for the real estate as well as limited liability protection and better access to financing.

D. Later Developments

The brothers' relationships did not improve after the 2006 plan was established. Nor did the work environment at Interstate. Shortly thereafter, Buddy was diagnosed with brain cancer which took his life in 2016. By 2008 he stopped working full time and went into the office no more than half time. By 2009 he stopped going every day and stayed only one to three hours when he did. He continued to insist on a buyout of his Interstate stock because of his brothers' previous buyouts. In January 2009 Ken and Don finally agreed to a partial buyback of Buddy's nonvoting shares. For years Ken and Don had resisted a

[*38] buyout because they worried that Interstate could not afford to buy Buddy's stock and a buyout could adversely affect their own inheritance and set a precedent for Interstate's stock value for estate tax purposes. In April 2009 Ken was also diagnosed with cancer. Ken's doctor advised him that his cancer was terminal. Ken outlived the life expectancy that his doctor had predicted.

In late 2008 AIG declared bankruptcy, causing the brothers to become concerned with the financial stability of the two American General policies. They were also concerned with the MassMutual policies. At some point, apparently after Mrs. Morrissette's death, the brothers decided to cancel the American General policies and replace them with policies from another insurer (replacement policies).

1. Mrs. Morrissette's Death

Mrs. Morrissette died on September 25, 2009. At that time, the AEM trusts and the CMM trust owned 82% of Interstate's voting stock and 90% of its nonvoting stock. The trusts distributed the voting and nonvoting stock to the brothers' AEM subtrusts. Afterward, each brother together with his children owned, directly or indirectly, an equal number of voting shares, 6.483 in accordance with the 1996 plan. Buddy's children, Bud and J.D., each owned .25

[*39] of a voting share that Buddy had given them as a gift. They were the only grandchildren who owned voting stock.

On October 30, 2009, the CMM trust transferred the split-dollar agreements to the dynasty trust that owned the respective life insurance policies by gift equal to Mrs. Morrissette's remaining generation-skipping transfer tax exemption and the remainder by sale in accordance with the 2006 amendment to the CMM trust. The dynasty trusts executed promissory notes for the sale portions payable to the CMM trust totaling $4.65 million and to Van Lines totaling approximately $300,000. The brothers sought to have the total amount of the promissory notes correspond to the estate's claimed value of the split-dollar rights. The transfers terminated the split-dollar agreements as the dynasty trusts were on both sides of the agreements after the transfers. The transfers also precluded any future gift tax from the cost of current protection from the CMM trust's payment of the premiums under the economic benefit regime. However, the transfers did not result in cancellation of the underlying life insurance policies.

In July 2010 Don inquired about canceling the replacement policies. His reason for doing so is unclear. Cancellation would have negatively affected Mr. Meltzer's future commission rates. The replacement policies were not valued as part of the gross estate. Mr. McNair advised that the IRS had three years to audit

[*40] the estate tax return and insisted that the policies remain in effect until the IRS audit was settled. He wrote that the IRS was "going to have issues with the amount of discounts we are claiming" for the split-dollar rights. At that time the estate had not yet filed the estate tax return but did so six months later.

2.      Additional Amendments to Shareholders Agreement

The shareholders agreement was amended twice after Mrs. Morrissette's death, first to allow distribution of Interstate stock to marital trusts and lifetime transfers to certain family members, and then, after Buddy's death, to include a mandatory buy-sell provision of each brother's nonvoting stock upon the death of the last to die of Don and Ken, an optional buy-sell provision for Ken or Don to sell his stock during his lifetime with a right of first offer to Interstate. Although the amendments went against Mr. and Mrs. Morrissette's wishes, the brothers believed that they would better ensure that Interstate remained family owned and avoid problems similar to those that had previously occurred.

3.      Buddy's Death

Buddy died in 2016. His AEM subtrust distributed its Interstate voting stock to the three AEM grandchildren subtrusts established for the benefit of his three children. His nonvoting stock passed to a marital trust. Buddy's children wanted to keep the Interstate stock. Bud and J.D. continued to work at Interstate.

[*41] Accordingly, Ken's and Don's dynasty trusts did not use the death benefits to purchase Interstate's stock. Ken's and Don's dynasty trusts received approximately $19.5 million in death benefits from the two policies insuring Buddy's life, earning a tax-free return of 6.5%. Ken's and Don's dynasty trusts paid over a portion to Buddy's dynasty trust in accordance with the sharing agreement. Each dynasty trust received $6.5 million.

Ken, Don, and Buddy's children and widow continue to own 100% of Interstate, and Mr. and Mrs. Morrissette's grandchildren run the business. At the time of trial, Bud was the CEO and J.D. was the president of Van Lines. Ken's son had joined Interstate as corporate counsel.

E.    Estate Tax Return

The estate filed Form 706, United States Estate (and Generation-Skipping Transfer) Tax Return, on December 10, 2010. The estate included all assets held in the CMM trust in the gross estate and reported a fair market value of $7,479,000 for the CMM trust's split-dollar rights as of October 30, 2009, the date on which that the CMM trust transferred the split-dollar agreements to the dynasty trusts and therefore the applicable date for valuing Mrs. Morrissette's split-dollar

[*42] rights (valuation date).[5]  See sec. 2032(a) (allowing for election of an

alternate valuation date on the date of a distribution or sale that occurs within six

months of the decedent's death).  Craig Stephanson, one of the appraisers that Mr.

McNair recommended, prepared the appraisal attached to the return which is

discussed below.  Ken read the appraisal before the estate tax return was filed.

Petitioners concede that Mr. Stephanson incorrectly deducted gift tax of

$2.97 million in his computation of the fair market value on the assumption that

gift tax would transfer with the split-dollar agreements.  On the basis of this

concession, petitioners assert that Mr. Stephanson's analysis results in a fair

---

[5]The estate claimed fair market values of the split-dollar rights and the policies had cash surrender values on the valuation date as follows:

| Policy owner | Insured | Reported | Cash surrender value |
|---|---|---|---|
| Buddy's trust | Don | $1,245,000 | $5,372,912 |
| | Ken | 1,198,000 | 5,236,488 |
| Don's trust | Buddy | 1,323,000 | 5,567,674 |
| | Ken | 1,198,000 | 5,405,130 |
| Ken's trust | Don | 1,192,000 | 5,405,130 |
| | Buddy | 1,323,000 | 5,567,674 |
| Total | | 7,479,000 | 32,555,008 |

[*43] market value of $10,449,000. The estate reported the $4 million Van Lines loan plus unpaid interest that accrued during 2009 of $176,308 as a liability.

F.    Penalty Determination

Revenue Agent John Stewart was assigned to the examination of the estate tax return and prepared the revenue agent's report (RAR). On October 22, 2013, he prepared a penalty approval form and marked boxes on the form for "no" for penalties under section 6662(b) and (h). No penalty was marked "yes" to assert a penalty. He wrote that the "values were based upon arm's-length appraisals by qualified appraisers and this reliance constitutes reasonable cause for not applying the penalties. The proposed value * * * is based upon a different interpretation of the law. There is no evidence of preparer negligence or wilful [sic] understatement." The form contains an electronic signature of RA Stewart's immediate supervisor, Miliene McCutcheon, dated October 22, 2013. However, Ms. McCutcheon was not the IRS employee who placed her electronic signature on the form. Ms. McCutcheon did not give her approval for the nonassertion of penalties as set forth on the form.

Also on that date, RA Stewart and Ms. McCutcheon discussed the proposed adjustments to the gross estate and the section 6662 penalties including whether penalties should be asserted for the undervaluation of the split-dollar rights. Ms.

**[\*44]** McCutcheon expressed her view that the section 6662(b) and (h) valuation penalties apply. She instructed RA Stewart to prepare a revised civil penalty approval form for her signature. A revised form is not in the record.

On October 23, 2013, RA Stewart sent an email to Ms. McCutcheon that discussed the penalties. He wrote: "I should have asked you before preparing this Penalty form. Do you think we should apply the section 6662(h) gross undervaluation to the split-dollar receivables?" Ms. McCutcheon answered "yes" and responded that the 40% penalty should be applied "based on the extent that a portion of the underpayment * * * is attributable to one or more gross valuation misstatements * * * * by substituting 40 percent for 20 percent."

In the email, RA Stewart also reiterated his "opinion" that the case involves a "very legal issue" that is "debatable" and the estate followed the advice of an attorney. Ms. McCutcheon responded the issue "may be debated" but not with the short time remaining in the period of limitations. On November 6, 2013, RA Stewart provided a copy of the RAR to the estate formally communicating the initial penalty determination.

G.    Expert Testimony

In addition to Mr. Stephanson's valuation, petitioners presented the expert testimony of Shishir Khetan who determined a fair market value for the

**[\*45]** split-dollar rights of $7,808,314. Respondent presented the expert testimony of Francis Burns. Mr. Burns opined that in the absence of the mutual termination restriction the split-dollar rights would have a fair market value equal to the policies' cash surrender values. In the alternative, he opined that with the mutual termination restriction the split-dollar rights had a fair market value of $17,501,391 assuming that the split-dollar agreements remained in effect until the brothers' deaths or $27,857,709 assuming they were terminated on December 31, 2013, three years after the estate tax return was filed (termination assumption).

1. Discounted Cashflow Method

All three experts used the discounted cashflow method of valuation. For each policy, they calculated an expected value of the policy for each year of the insured's life expectancy, i.e., the anticipated holding period, by determining the policy's expected cash surrender value for each year multiplied by the probability of the insured's death that year (probability-adjusted expected value). They discounted the probability-adjusted expected value to a present value and then totaled the annual amounts to determine the fair market value of the split-dollar rights.

The experts determined slightly different amounts for the annual expected cash surrender values and also used different probabilities of mortality as

**[*46]** explained further below. However, the primary difference between the valuations is the discount rates that the experts used to compute the present values of the probability-adjusted expected values.

      a.      <u>Cash Surrender Values</u>

Mr. Burns and Mr. Stephanson determined the expected cash surrender values on the basis of the anticipated appreciation rates in the policies' cash values according to MassMutual's and American General's estimates and set forth in each insurance company's policy illustrations (policy illustration yield). The policy illustrations were issued in September and December 2009. In their policy illustrations, the insurance companies estimate that the yields on the policies are based on how the insurance companies' investment portfolios are performing. Mr. Burns and Mr. Stephanson used policy illustration yields of 5.5% and 4.5% for the American General and MassMutual policies, respectively. For American General, Dr. Khetan used a policy illustration issued in April 2010 with a yield of 4.5%. This lower yield decreased his expected cash surrender values and opined fair market values.

In addition to policy illustration yields, Dr. Khetan considered the 3% minimum interest rate in his computation of the expected cash surrender values, giving each rate equal weight for a blended yield. The blended yield resulted in

[*47] lower expected cash surrender values than those determined by Mr. Burns and Mr. Stephanson. Use of the blended yield decreased Dr. Khetan's opined fair market values for the split-dollar rights more than if he had used only the policy illustration yields. Dr. Khetan opined that the blended yield better estimates expected cash surrender values because of economic uncertainties, historically low interest rates on the valuation date, and the downward trend in the policy illustration yields after the policies were purchased. He opined that an investor would consider both policy illustration yields and the minimum interest rate when making investment decisions.

b.    Mortality Probability

Mr. Stephanson and Dr. Khetan used mortality probabilities published by the IRS, Life Table 90CM (IRS mortality table), that rely on mortality statistics of the general population. Mr. Burns' use of mortality probabilities that factor in lifestyle considerations resulted in lower probabilities of mortality in the earlier years of the policies than those in the IRS mortality table. Respondent concedes that use of the IRS mortality table was reasonable.

c.    Discount Rate

The experts characterize the discount rate as the rate of return required to induce an investor to enter into the split-dollar agreements on the basis of risk

[*48] involved and the expected income stream from the agreements. They agree that the returns on the insurance companies' investment portfolios reflect their ability to pay out on the policies. They also agree that the risk of outright default by the insurance companies on the policy obligations is low. Both insurance companies had strong credit ratings, and the life insurance industry is heavily regulated with strict capital reserve requirements, which lowers the risk.

The experts also agree that the discount rate should be based on the yields on alternative investments with risks comparable to the split-dollar agreements. However, the experts identify different investments as suitable alternatives. As a result, the discount rates they applied vary considerably. Finally, they agree that the fair market value of the split-dollar rights should be discounted to account for a lack of marketability of the split-dollar agreements.

2.    Respondent's Valuation

To determine the discount rate, Mr. Burns determined a range for a base discount rate (base range) (6.8% to 10.9% for American General and 5.7% to 7.1% for MassMutual), used the midpoint of the range to set a base discount rate (8.85% and 6.4% for American General and MassMutual, respectively), and then added a .5 premium for a lack of marketability (liquidity premium) to the base rates for

**[*49]** both companies. Using this approach, he determined a discount rate of 9.35% for the American General policies and 6.9% for the MassMutual policies.

To establish the base ranges, Mr. Burns considered the insurance companies' policy illustration yields, the yields on their investment portfolios from 1999 to 2008 (historic investment yields), yields on their unsecured debt (company-specific debt), and yields on corporate debt in the life insurance industry (industry debt). Mr. Burns testified that these yields reflect the extremely low default risk on the policies.

Historic yields reflect the rates of the annual increase in the policy's cash value. Yields decreased from the transfer date to the valuation date, which Mr. Burns explained reflects the intervening recession. He testified that the historic investment yields were in line with the conservative nature of the insurers' investment portfolios. Over 50% of their investment portfolios consisted of publicly traded and privately placed investment-grade corporate bonds, asset-backed and mortgage-backed securities, and U.S. Treasury securities.

Mr. Burns used the historic yields to calculate an investment yield (Burns investment yields or Burns yield) on the basis of the differences between the historic yields and yields on the 10-year and 20-year U.S. Treasury bonds during the same 10-year period. For each year, he determined the annual spreads between

[*50] each insurance company's historic yield and the yields on 10-year and 20-year U.S. Treasury bonds (yield spreads) and then determined interquartile average yield spreads. For American General, he determined average yield spreads during the 10-year period of 3.03% and 2.57% for 10-year and 20-year U.S. Treasury bonds, respectively, and for MassMutual, 2.09% and 1.55%, respectively. He added these average yield spreads to the spot yields on 10-year and 20-year U.S. Treasury bonds on the valuation date, 3.41% and 4.19%, respectively, to determine investment yields of 6.44% to 6.76% for American General and 5.5% to 5.74% for MassMutual.

For MassMutual's company-specific debt, Mr. Burns considered yields-to-maturity (YTM) on its surplus notes and for American General's, corporate bonds issued by its parent company, AIG. The debt had remaining terms of 7 to 26.5 years and 14 to 29.6 years for MassMutual and American General, respectively. Surplus notes are equitylike investments that are subordinate to present and future policyholder claims, making them similar to long-term, unsecured debt according to Mr. Burns.

For industry debt, Mr. Burns considered yields for 10-year and 30-year industry bonds from market data compiled by Bloomberg (industry Bloomberg). He testified that yields increase as the credit quality of the bonds decreases,

**[*51]** reflecting the additional compensation demanded by investors for accepting the greater risk of the lower-rated bonds. Because of the constraints of the market data, he considered industry debt that was somewhat riskier than the company-specific debt. For Mass Mutual debt, he considered industry debt with credit ratings of A, which would be riskier than MassMutual's AA+ rated debt. For American General, he considered industry debt with ratings of A and BBB. AIG's debt had a rating of AAA.

In addition to Bloomberg market data, Mr. Burns also independently researched all investment-grade, long-term industry bonds with 15 to 20 years remaining to maturity from market data compiled by Thomson Reuters Eikon (industry Thomson Reuters). He included both publicly traded bonds (public bonds) and privately placed bonds (private bonds) in his research. The population of the bonds that Mr. Burns identified is small; for A rated bonds, six public and eight private, for BBB rated bonds, nine public and three private. A rated public bonds had YTM from 5.94% to 11.86%, and BBB rated public bonds from 7.49% to 10.74%. Mr. Burns determined the average and median YTM on the basis of YTM on both private and public bonds. The Thomson Reuters market data include two public bonds issued by AIG Life Insurance Co. (AIG Life), a parent company of American General and subsidiary of AIG in its multitiered ownership

[*52] structure. The two AIG Life bonds had YTM of 8.92% and 11.86% and remaining terms of 19.3 years and 15.7 years, respectively.

In total, Mr. Burns provided the following yields:

| Investment | American General | MassMutual |
|---|---|---|
| Policy illustration | 5.5% | 4.5% |
| Historic | 6.15 - 8.57 | 6.17 - 7.6 |
| Average | 8 | 6.7 |
| Burns | 6.44 - 6.76 | 5.5 - 5.74 |
| Company-specific debt | 9.57 - 10.92 | 6.89 - 7.09 |
| Industry Bloomberg | | |
| 10-year bonds | 5.54 - 7.27 | 5.54 |
| 30-year bonds | 6.12 - 7.11 | 6.12 |
| Industry Thomson Reuters | | |
| Average | 7.92 - 8.53 | 7.92 |
| Median | 7.81 - 8.42 | 7.81 |

On the basis of the above information, Mr. Burns determined a base range of 6.8% to 10.9% for American General and 5.7% to 7.1% for MassMutual. The parameters for the base ranges correspond to the Burns yields (low end) and the company-specific debt yields (high end). The midpoints of the ranges are 8.85% and 6.4% for American General and MassMutual, respectively.

[*53] Mr. Burns determined a .5 liquidity premium using market data from Thomson Reuters for public and private bonds. He provided the range, average, and median YTM from the market data as follows:

| Bond type | Range | Average | Median |
|---|---|---|---|
| A rated private | 6.41 - 10.02% | 8.1% | 8.09% |
| A rated public | 5.94 - 11.86 | 7.69 | 6.72 |
| All A rated | 5.94 - 11.86 | 7.81 | 7.92 |
| BBB rated private | 8.55 - 8.89 | 8.71 | 8.73 |
| BBB rated public | 7.49 - 10.74 | 8.47 | 8.03 |
| All BBB rated | 7.49 - 10.74 | 8.42 | 8.53 |

The percentage differences in average and median YTM (yield differentials) are:

| Bond type comparison | Average | Median |
|---|---|---|
| Private v. all bonds (A rated) | .18 | .28 |
| Private v. public (A rated) | .41 | 1.37 |
| Private v. all bonds (BBB rated) | .19 | .31 |
| Private v. public (BBB rated) | .24 | .7 |

Mr. Burns used the yield differentials in the average YTM on private bonds versus all bonds, .18 and .19 for A rated and B rated bonds, respectively, as the basis for the liquidity premium but opined that a liquidity premium of .5 was

[*54] appropriate, acknowledging the split-dollar agreements are less illiquid than private bonds.

Finally, Mr. Burns acknowledged that AIG's 2008 bankruptcy and Government bailout might affect an investor's decision to purchase American General's life insurance policies even though American General did not have financial obligations with respect to AIG's debt. He opined that a higher discount rate should apply for American General than for MassMutual. He further testified that AIG's company-specific debt yield accounted for its financial instability and was an appropriate indicator of the discount rate for American General.

3. Petitioners' Valuations

Mr. Stephanson and Dr. Khetan determined a discount rate of 15% for both insurers on the basis of yields on life settlements. A life settlement transaction involves the sale of an existing life insurance policy in a secondary market for an immediate cash payment. The investor in a life settlement may be required to pay premiums on the policy. The average death benefit for policies sold in life settlements was $75,000, substantially lower than the $10 million death benefits per policy underlying the split-dollar agreements.

Both experts testified that life settlements are suitable alternative investments to the split-dollar agreements in terms of the associated risks. They

[*55] opined that both life settlements and the split-dollar agreements depend on the insured's life expectancy, have uncertain holding periods and uncertain yields, and lack periodic income distributions.

### a. Mr. Stephanson's Valuation

Mr. Stephanson testified that life settlement yields ranged from 15% to 18% and averaged 15.83%. He relied on one source for the life settlement yield, a June 2009 magazine article, in his appraisal attached to the estate tax return. He identified the following risks from the split-dollar agreements: the size of the investment ($5 million per agreement), a lack of periodic income distributions, the uncertain holding period, a lack of marketability, and the complexity of the split-dollar agreements. He testified that the complexity of the split-dollar agreements and the limited financial information available to investors would make it difficult for investors to price the split-dollar rights. He opined that these factors limit the pool of potential investors, increase risk, and increase the discount rate. He acknowledged that the risk related to the uncertain holding period is partially remedied by mortality statistics.

Mr. Stephanson considered other alternative investments including 30-year U.S. Treasury bonds, privately held notes, publicly traded securities for large and small companies, and private investments in real estate (private real estate) and

[*56] privately owned businesses (private entities).  He provided yields on these investments as follows:

| Investment type | Yield |
|---|---|
| Privately held notes | 10 - 15% |
| 30-year U.S. Treasury bonds | 4.1 |
| Large company stock | 5.9 |
| Small company stock | 11.9 |
| Private real estate | 16 - 25 |
| Private entities | 18 - 35 |

Mr. Stephanson opined that the split-dollar agreements were substantially riskier than long-term U.S. Treasury bonds and the industry bonds that Mr. Burns relied upon because the split-dollar agreements did not have a fixed maturity date, periodic interest payments, or an organized market.  Mr. Stephanson opined that the discount rate should be higher than YTM on A rated public bonds.  The median and the average industry Thomson Reuters YTMs for public bonds were 6.72% and 7.69%, respectively.  Finally, he opined that the risk of investing in the split-dollar agreements was significantly lower than the risks from private real estate and private entities and, thus, opined that the discount rate should be lower than yields on those investments, which ranged from 16% to 35%.

**[\*57]**      b.    <u>Dr. Khetan's Valuation</u>

Dr. Khetan prepared a more detailed review of life settlement yields but also determined a 15% discount rate. He researched multiple written sources, including news articles, marketing materials, and online sources, and interviewed market participants. The market participants, an actuarial firm and a life settlement specialist firm, provided ranges of 12% to 15% and 16% to 22%, respectively. The yields from the other sources Dr. Khetan considered varied considerably. In his analysis, he determined that the appropriate range was from 9.3% to 23.2%.

Dr. Khetan took an approach similar to Mr. Stephanson's, identifying the risks from an investment in the split-dollar agreements and researching financial instruments to identify alternative investments with similar risks.[6] He determined that investments in split-dollar agreements had the following risks: a lack of marketability, a lack of control over the underlying life insurance policies, limited collateral, an uncertain holding period, an uncertain yield, a potential for loss, and no periodic income distributions. He acknowledged differences between the split-dollar agreements and life settlements including that an investor in a life

---

[6]Dr. Khetan also considered corporate bonds and the sale of structured annuity settlements and nonassignable lottery winnings but determined life settlements were the most suitable alternative investment.

[*58] settlement may need to pay premiums and the insured typically has impaired health from a nonterminal illness such as diabetes. Finally, he opined that life settlements are more liquid than the split-dollar agreements.

Dr. Khetan's sources lacked transparency and did not disclose information about the policies, the insurance companies that underwrote the policies, or the insureds' life expectancies or health. He included yields on viatical settlements, a type of life settlement where the insured sells his policy after being diagnosed as terminally ill, making viatical settlements substantially riskier with higher yields than life settlements. The insured's shortened life expectancy in a viatical settlement causes the return to be very sensitive to any inaccuracies in the life expectancy estimate. The return would decrease sharply if the insured were to outlive his life expectancy even for a short time.

c.      Mr. Burns' Rebuttal

Mr. Burns disagreed with the use of life settlement yields to determine the discount rate, primarily because of the lack of transparency and the lack of disclosure of policy information in the sources that Mr. Stephanson and Dr. Khetan relied upon. Mr. Burns also testified to other factors that made life settlements unreliable as alternative investments. He testified that the insured in a life settlement typically has a life expectancy of 11 to 12 years and the yield is

[*59] sensitive to any inaccuracy in the life expectancy. If the insured were to outlive the life expectancy, the yield would decrease and the decrease would be more dramatic for a shorter life expectancy. He testified that the opposite occurs with the split-dollar agreements: The cash surrender values are likely to increase throughout the brothers' lives and, thus, the amount of the CMM trust's payout would continue to increase if a brother outlived his life expectancy.

Finally, Mr. Burns provided market data showing that life settlement yields are lower than the 15% discount rate determined by Mr. Stephanson and Dr. Khetan. His data included a 2008 academic study showing life settlement yields of 8% to 12% and a 2012 industry study showing yields of 9% to 13%. He further testified that he would not rely on these studies because of a lack of transparency and their failure to identify sources for the yields.

        d.     Investment Value

Mr. Stephanson also determined a value for the split-dollar rights on the transfer date using an investment value standard. Respondent did not provide expert testimony on the value of the split-dollar rights on the transfer date. Investment value is a recognized standard of value for appraisal purposes. It values an asset from the perspective of a particular investor, in this case Mrs. Morrissette, on the basis of her individual investment goals and risk sensitivity

[*60] rather than from the perspective of a hypothetical investor. Mr. Stephanson opined that in certain situations a specific investor may be willing to pay a higher price for an asset than a hypothetical buyer. He testified that investors may weigh noneconomic factors, for example, the social responsibility of an investment or its environmental, social, and governance impact such as the sustainability or environmental impact of a corporation's actions. He testified that not all investors seek to maximize financial gain. Mr. Burns agreed with this statement as discussed further below.

For the investment value Mr. Stephanson considered the risks specific to the CMM trust in owning the split-dollar rights and the return required to induce the CMM trust to invest in the split-dollar agreements in the light of Mrs. Morrissette's unique goals. He evaluated the same risks that he identified in his fair market value analysis but opined that Mrs. Morrissette would disregard or marginalize the risks as compared to how a hypothetical investor would view them. He testified that Mrs. Morrissette could have placed a higher value on the split-dollar agreements than a hypothetical investor would have in the open market because the agreements helped her to accomplish her goal of keeping Interstate in the family. He opined that Mrs. Morrissette would have been less concerned with the large size of the investment, lack of periodic income distribution, uncertain

[*61] holding periods, lack of marketability, and complexity and atypical characteristics of the split-dollar agreements. He opined that the most significant difference in the valuation for Mrs. Morrissette and for a hypothetical investor is the intangible benefits that Mrs. Morrissette received from the split-dollar agreements including retained family ownership of Interstate, a smooth transfer of management to her grandchildren, and an inducement for her grandchildren to work at Interstate.

On the basis of these considerations, Mr. Stephanson determined a lower discount rate for the investment value of 4.54% on the basis of yields on long-term, tax-exempt, zero-coupon municipal bonds (municipal bonds). He assumed that the death benefits would not be taxed when paid to the CMM trust. He understood that Mrs. Morrissette had liquidated bonds to pay the premiums which he testified supported his use of municipal bond yields. He analyzed 181 municipal bonds issued from May 1, 2006, to April 30, 2007, with terms of 11.9 to 33.7 years. The offering yields ranged from 4.2% to 5.1%, and the median offering yield was 4.54%. He did not provide YTM. He also researched data compiled by the Government Publishing Office that established an average yield for high-grade municipal bonds of 4.32%. He further testified that policy

**[*62]** illustration yields, 5.5% and 4.5% for American General and MassMutual, respectively, support the 4.54% discount rate.

Finally, Mr. Stephanson testified to the need to consider the significant changes in the economic conditions between the transfer date and the valuation date, specifically the intervening economic recession in the fall of 2008, historically low interest rates, market volatility, and a decreased availability of credit on the valuation date. He opined that as of the valuation date investors were choosing less risky investments with lower expected returns but greater stability. He testified that these changes in investors' decision making would have adversely affected the marketability of the split-dollar agreements on the valuation date and would support a higher discount rate on the valuation date than on the transfer date.

Mr. Burns recognized the concept of investment value as a measure of value and agreed that a purchaser might pay more than the fair market value for an asset in certain circumstances such as when acquiring a business that could provide unique synergies, purchasing a controlling interest in a corporation, i.e., a control premium, or purchasing real estate adjacent to property the investor already owns. However, he testified that investment value is not an appropriate measure of value for financial assets such as the split-dollar rights. At respondent's request, Mr.

[*63] Burns determined an investment value of approximately $21.2 million on the basis of Mr. Stephanson's analysis but with a discount rate of 6.1% on the assumption that the death benefits paid to the CMM trust would not be tax exempt.

4.      Comparable Split-Dollar Agreements

Mr. Burns researched public split-dollar agreements from corporate filings with the Securities and Exchange Commission (corporate filings).  He defined public split-dollar agreements as generally involving unrelated parties.  He reviewed agreements entered into for the purpose of providing an employee benefit, a reward for service, or an inducement for continued employment.  Every agreement that he researched was between an employer and an executive, director, or other employee.  At respondent's instruction, Mr. Burns limited his review to agreements in which the corporation was listed as the policy owner.  He identified and reviewed 89 agreements dated between 1992 and 2017.

According to Mr. Burns' review, 51 agreements allowed the employer to unilaterally terminate the split-dollar agreements and an additional 24 agreements allowed the employer to terminate the employee without cause, which Mr. Burns also characterized as a right to unilaterally terminate the split-dollar agreement.  According to these numbers, Mr. Burns opined that 84% of the agreements gave to the employer the right to unilaterally terminate the split-dollar agreement.  Mr.

[*64] Burns determined that 13 of the 14 remaining agreements gave the employer, either expressly or implicitly, the right to borrow against the policies or affirmed the employer's full ownership of the underlying policies. He characterized the right to borrow or the affirmation of the employer's right as the policy owner as providing to the employer unilateral access to the cash surrender values.

Mr. Burns concluded that only one agreement contained a mutual termination restriction. The employees under that agreement were the company's two founders and 20% shareholders. The purpose of the agreement was to fund the purchase of the insureds' stock and protect the company from a large disposition of stock upon their deaths.

Some of the split-dollar agreements had other provisions that Mr. Burns did not consider, including 10 agreements where the employees' rights in the split-dollar agreements could vest and thereafter the employer could no longer unilaterally terminate, 9 that restricted the employer's right to unilaterally terminate the split-dollar agreements to where the employer terminated the employee for cause, 2 that prevented unilateral termination after a change of control, and 1 that limited the employer's right to unilaterally terminate the agreement to instances where the agreement caused "significant financial harm".

[*65] An additional 12 agreements appeared to contain inconsistent or ambiguous terms that allowed termination of the employee only for cause or provided for vesting but contained a unilateral termination right.

OPINION

Section 2001(a) imposes a Federal estate tax on the transfer of a decedent's taxable estate. The taxable estate is defined as the value of the gross estate less applicable deductions. Sec. 2051. The gross estate includes "all property, real or personal, tangible or intangible, wherever situated'', to the extent provided in sections 2033 through 2045. Sec. 2031(a). Section 2033 is a broad inclusion provision and includes the value of all property in the gross estate to the extent of the decedent's interest in the property at the time of her death. Sections 2034 through 2045 explicitly mandate inclusion of more narrowly defined property interests. Sections 2036 and 2038 are at issue here.

The parties agree that the CMM trust was a revocable trust on the date of Mrs. Morrissette's death, and the values of all assets that it held are includible in the gross estate. Accordingly, petitioners agree that the fair market values of the split-dollar rights are includible in the gross estate. Respondent seeks to apply sections 2036 and 2038 to the transfer of the premiums that the CMM trust made as part of split-dollar agreements and argues that the values of the split-dollar

[*66] rights should be included in the gross estate at least in the amount of the transferred premiums, $30 million total, or the cash surrender values of the underlying policies, approximately $32.6 million total.

Sections 2036 and 2038 require that inter vivos transfers be included in the gross estate where the decedent retained certain rights or powers in the transferred property. Both sections impose "a broad scheme of inclusion in the gross estate, not limited by the form of the transaction, but concerned with all inter vivos transfers where outright disposition of the property is delayed until the transferor's death." Guynn v. United States, 437 F.2d 1148, 1150 (4th Cir. 1971). Sections 2036 and 2038 are aimed at preventing the use of inter vivos transfers to avoid estate tax where the decedent has retained enjoyment of the property. Estate of Strangi v. Commissioner, 417 F.3d 468, 476 (5th Cir. 2005), aff'g T.C. Memo. 2003-145; Estate of Thompson v. Commissioner, 382 F.3d 367, 375 (3d Cir. 2004), aff'g T.C. Memo. 2002-246.

Section 2036, titled "Transfers With Retained Life Estate", is designed to recapture the values of assets that the decedent transferred during her lifetime where she retained economic benefits of the assets. It is intended to include in the gross estate any inter vivos transfers that are essentially testamentary. Estate of Bongard v. Commissioner, 124 T.C. 95, 112 (2005). Section 2036(a)(1) applies

[*67] where the decedent retained possession or enjoyment of the transferred property or a right to income from the property, and section 2036(a)(2) applies where the decedent retained a right or power to designate the persons who would possess or enjoy the property or receive the income from the property (right to designate). The right to designate can be held either alone or in conjunction with another person. Id. para. (2). Section 2038(a) addresses revocable transfers. It applies where the decedent has the power to alter, amend, revoke, or terminate the transferee's enjoyment of the property (power to alter) without regard to when or from what source the decedent acquired such power and without regard to whether the decedent holds the power alone or in conjunction with any other person.

A split-dollar agreement is an arrangement between an owner and a nonowner of a life insurance contract in which one party pays all or any portion of the premiums on the life insurance contract, directly or indirectly, and is entitled to recover all or any portion of those premiums from, or payment is secured by, the proceeds of the life insurance contract. Sec. 1.61-22(b)(1), Income Tax Regs. The split-dollar regulations recognize the use of split-dollar arrangements for gift tax purposes. For a split-dollar agreement to which the economic benefit regime applies, the donee may exclude from gross income death benefits received from the policy as a result of the donor's having paid gift tax on the cost of current

**[\*68]** protection.  Where the requirements of the economic benefit regime are not satisfied, the donor's payment of the premium is treated as a loan.  See sec. 1.7872-15(a)(2)(i), Income Tax Regs.

Respondent asserts that under the split-dollar agreements the CMM trust retained possession, enjoyment or a right to income under section 2036(a)(1), a right to designate under section 2036(a)(2), or a power to alter under section 2038(a) and, under any of these sections, the cash surrender values of the policies are included in the gross estate.  In general, sections 2036 and 2038 apply if three conditions are met:  (1) the decedent made an inter vivos transfer of property,[7] (2) the transfer was not a bona fide sale for adequate and full consideration, and (3) the decedent retained an interest in or a right or power over the transferred property that she did not relinquish before her death, as defined in either section. See Estate of Black v. Commissioner, 133 T.C. 340, 361-362 (2009); Estate of Bongard v. Commissioner, 124 T.C. at 112.

We have previously held that a decedent's right to terminate a split-dollar agreement and to recover at least the cash surrender value were rights, held in conjunction with another person, to designate the persons who would possess or

---

[7]The parties assumed for purposes of this case that Mrs. Morrissette through the CMM trust made an inter vivos transfer for estate tax purposes.

[*69] enjoy the transferred property under section 2036(a)(2) and to alter, amend, revoke, or terminate the transfer under section 2038(a)(1). Estate of Cahill v. Commissioner, T.C. Memo. 2018-84, at *15. In that case, the estate argued that neither section applied because the decedent held the right to terminate the split-dollar agreements only in conjunction with the counterparty to the split-dollar agreement and the counterparty could have prevented the decedent from terminating the split-dollar agreements. Id. at *15-*16. We held that under the estate's argument "the words 'in conjunction with any person' in section 2036(a)(2), and 'in conjunction with any other person' in section 2038(a)(1), would have no force or meaning." Id. at *15. Accordingly, we denied the estate's motion for partial summary judgment that sections 2036 and 2038 did not apply or that the bona fide sale exception of either section was met. Id. at *16. The Commissioner had not filed a motion for partial summary judgment on these issues, and we declined to grant summary judgment in his favor on the basis that "there may be other facts or theories not yet presented". Id. at *35.

Petitioners previously filed a motion for partial summary judgment that Mrs. Morrissette did not retain interests, rights, or powers as defined in section 2036(a)(2) or 2038(a). Respondent objected to petitioners' motion but did not file a cross-motion. In an order dated February 19, 2019, we denied petitioner's

**[\*70]** motion, relying on Estate of Cahill, and did not consider section 2036(a)(1). In their motion, petitioners presented arguments not addressed by the Court in Estate of Cahill and not yet addressed in this case. We do not need to resolve these issues now. For the reasons set forth below, we find that the bona fide sale exceptions to both sections are satisfied. Accordingly, sections 2036 and 2038 do not require inclusion of the premiums or policies' cash surrender values in the gross estate. Rather, the issue in this case is valuation of the split-dollar rights.

A.     Bona Fide Sale for Adequate and Full Consideration

Sections 2036 and 2038 both provide exceptions to the recapture of an inter vivos transfer in the gross estate if the transfer was a bona fide sale for an adequate and full consideration for money or money's worth. The exceptions have the same meaning for both sections. Estate of Mirowski v. Commissioner, T.C. Memo. 2008-74. The exceptions aim to preclude the reach of sections 2036 and 2038 to transfers in which the decedent received consideration sufficient to protect against the depletion of the estate's assets. See Estate of Magnin v. Commissioner, 184 F.3d 1074, 1079 (9th Cir. 1999), rev'g and remanding T.C. Memo. 1996-25.

We have interpreted the exceptions as two prongs: (1) a legitimate and significant nontax purpose and (2) adequate and full consideration for money or

[*71] money's worth.  Estate of Powell v. Commissioner, 148 T.C. 392, 411 (2017).  Before we examine the two prongs, we address respondent's preliminary argument that the CMM trust's payment of the premiums does not constitute a sale for purposes of the exceptions.  He argues that the premium payment was not a sale because the dynasty trusts did not pay any consideration to the CMM trust.  He argues that without consideration the transfer does not qualify as a sale.  He argues that the split-dollar agreements fail to satisfy the definition of a sale, citing the legal definition of a sale, the transfer of property for a price or the agreement by which such a transfer takes place.  Black's Law Dictionary 1537 (10th ed. 2014).  He argues that the dynasty trusts did not convey the right to repayment and characterizes the transactions as the CMM trust's retaining a right to repayment.

Neither sections 2036 and 2038 nor the accompanying regulations define the term "sale".  The regulations indicate a broad interpretation of the term "sale" to include transactions that may not otherwise be considered sales in the strictest sense.  Secs. 20.2036-1(a), 20.2038-1(a)(1), Estate Tax Regs.  We have also interpreted the term "sale" for purposes of the bona fide sale exceptions broadly to include transfers that are not necessarily sales and have defined the term "transfer" to mean any voluntary act of transferring property.  Estate of Bongard v. Commissioner, 124 T.C. at 113; see Estate of Stone v. Commissioner, T.C. Memo.

**[*72]** 2003-309 (treating a contribution of assets to a business entity in exchange for an interest in the entity as a sale for purposes of section 2036(a)). We have not relied on the dictionary definition of a sale and do not adopt it now.

Respondent concedes on brief that "[t]here is no doubt that the CMM Trust transferred property to each of the Dynasty Trusts". Instead, he argues that the CMM trust made a transfer and retained the right to repayment. He argues that a retained right to repayment is not a right conveyed by the dynasty trusts and is not consideration. Under the terms of the split-dollar agreements, the dynasty trusts conveyed rights under the life insurance policies that they owned including the right to payment of the death benefits directly from the insurance companies upon the deaths of the insureds. Accordingly, we find that there was a sale within the broad definition of that term.

On the basis of the brothers' credible testimony, we find as a matter of fact that the CMM trust's payment of the premiums was a voluntary act made in good faith. The CMM trust actually parted with an interest in the transferred funds as it could not obtain immediate repayment. There was a bargained-for exchange under each split-dollar agreement that constitutes a sale for purposes of the bona fide sale exceptions. The parties to the split-dollar agreements could have merely structured the transfer as a loan with interest and repayment due when the

[*73] proceeds were collected from the policies. We may presume that the parties did not structure the fund of transfers in such a manner to ensure that the agreements would qualify for the economic benefit regime. We do not express any opinion about such an interpretation of the economic benefit regime.

1.     Legitimate Nontax Purpose

The first prong of the bona fide sale exception asks whether Mrs. Morrissette had a legitimate and significant nontax motive for entering into the split-dollar agreement. See Estate of Bongard v. Commissioner, 124 T.C. at 113, 118; Estate of Hurford v. Commissioner, T.C. Memo. 2008-278. The nontax purpose must be an actual motivation, not a theoretical justification, and we require some objective proof that the nontax reason was a significant factor that motivated the transfer. Estate of Bongard v. Commissioner, 124 T.C. at 118. We also recognize that "[l]egitimate nontax purposes are often inextricably interwoven with testamentary objectives." Id. at 121. Thus, a finding that the decedent sought to save estate tax does not preclude a finding of a bona fide sale so long as saving estate tax is not the predominant motive. Estate of Black v. Commissioner, 133 T.C. at 362-363. The bona fide sale exception further requires that the transfer be made in good faith. Estate of Bongard v. Commissioner, 124 T.C. at 118; see also sec. 20.2043-1(a), Estate Tax Regs.

[*74] In the context of transfers with respect to business entities, we and other courts have held that efficient, active management of the business and management succession may be legitimate, nontax purposes. Estate of Bigelow v. Commissioner, 503 F.3d 955, 972 (9th Cir. 2007), aff'g T.C. Memo. 2005-65; Estate of Strangi v. Commissioner, 417 F.3d at 481; Estate of Reynolds v. Commissioner, 55 T.C. 172, 194 (1970). Maintaining control over a family business can also be a legitimate, nontax purpose. Estate of Bischoff v. Commissioner, 69 T.C. 32, 39-41 (1977). We have found that closely held, family entities can provide a legitimate, nontax purpose even where the entity does not have an active business and was formed merely to perpetuate the decedent's buy-hold investment philosophy with respect to publicly traded stock. Estate of Schutt v. Commissioner, T.C. Memo. 2005-126, 2005 WL 1244686, at *25. Management of family assets can also be a valid nontax purpose. See, e.g., Kimbell v. United States, 371 F.3d 257 (5th Cir. 2004); Estate of Mirowski v. Commissioner, T.C. Memo. 2008-74; Estate of Stone v. Commissioner, T.C. Memo. 2003-309; Estate of Harrison v. Commissioner, T.C. Memo. 1987-8.

Mrs. Morrissette's desire to keep Interstate in her family is a legitimate, nontax reason for purposes of the bona fide sale exceptions. She put a premium on maintaining control over Interstate and passing on that control to future

[*75] generations. At trial, petitioners established that the 1996 plan was seriously flawed and the 2006 plan corrected those flaws. The split-dollar agreements were instrumental to ensuring that Interstate's ownership remained in her family after her sons died. The brothers had the CMM trust enter into the split-dollar agreements in good faith.

The brothers wanted to honor their parents' wish that the three brothers inherit Interstate equally and pass the company on to their children. However, they were also realistic about the need to pay estate tax and the possibility that they would need to sell part of Interstate to pay it. They believed that there was a significant chance that the family would lose control of Interstate if their families were not given this option especially in the light of the history of the fighting and continued hard feelings from Ken and Don's buyout nearly 20 years before. They recognized other problems with the 1996 plan. The split-dollar agreements provided each brother's children with the option to exit the business and cash out their interests after the brother's death and at the same time allowed the remaining brothers and their families to purchase the interests by funding the buyout. The buy-sell provision also prevented the brothers from selling their Interstate stock to outsiders as a means to retaliate against one another for past disputes.

[*76] The split-dollar agreements also served a second legitimate, nontax purpose, a smooth transition in Interstate's management. Bud and J.D. had dedicated their careers to Interstate and wanted to remain with the company for their professional futures. They had institutional knowledge. Bud and J.D. credibly testified about their concerns about the transition of Interstate's management to them. J.D. had considered leaving Interstate in 2005 because of these concerns and tried to talk to Buddy about them. Whenever Bud and J.D. raised management succession planning with Buddy, he was dismissive. Bud and J.D. had actually resorted to writing letters to Buddy because their attempts to discuss the issue with Buddy were not productive. Both Bud and J.D. had experienced the consequences in their jobs from the long-held grudges among the brothers.

Bud and J.D. also believed that their futures at Interstate could be jeopardized by the deficiencies in the 1996 plan, and they wanted better protection of Interstate as a family business. The 2006 plan helped to reduce the uncertainty of Bud and J.D.'s futures within Interstate by ensuring it would remain a family business. Bud and J.D. remained as executives and took over Interstate's management when the time came.

The family members faced a situation where many of them knew that the 1996 plan did not adequately protect Interstate and there was a significant risk that

[*77] the family would lose control over the business after Mrs. Morrissette's death or the brothers' deaths. Yet Buddy refused to fix the deficiencies in the 1996 plan until he, his brothers, and his sons met Mr. Meltzer and Mr. McNair. Family members credibly testified about their concerns with the 1996 plan. Mr. and Mrs. Morrissette had devised the 1996 plan to ease the tensions among the brothers, but it did little to improve the brothers' relationships. In fact, the plan caused Buddy to have more hard feelings. He felt cheated and believed that his parents did not recognize or reward his loyalty.

For years family members believed that they needed a better plan to protect Interstate as a family business. They understood that the 1996 plan could negatively affect Interstate's financial stability and its Government contracts, which accounted for a substantial portion of its business. Interstate's accountant tried to warn Buddy about the potential problems with the 1996 plan, but Buddy refused to do anything. In fact, after meeting Mr. McNair, Buddy initially refused to discuss any changes to the 1996 plan because of past family animosity. It is not clear what changed Buddy's mind. But Bud's meeting Mr. Meltzer finally moved the family forward to establish a long overdue succession plan for Interstate and Mrs. Morrissette's real estate holdings.

[*78] It is also clear to us that the split-dollar agreements were part of an estate tax saving strategy. The brothers were in part motivated by estate tax saving. It was not their only motivation, however. Respondent focuses on Mr. Meltzer's and Mr. McNair's marketing of the split-dollar arrangements as an estate tax saving strategy and the initial communications between the meeting attendances as evidence of tax motivations. The advisers' motives or marketing does not control our view of the purpose of the split-dollar agreements. Respondent also points to the fact that the brothers quickly decided to engage Mr. McNair after the June meeting as evidence of tax motivation. He ignores that it took approximately another five months to implement the transaction and it was not complete until approximately eight months after Bud first met Mr. Meltzer.

Our caselaw requires the presence of a legitimate, nontax purpose; it does not require the absence of a tax saving motivation. Tax saving was not the primary motivation. Significantly, Ken, who made most decisions relating to the split-dollar agreements, credibly testified that he would have engaged in the split-dollar agreements even if they had not provided any estate tax saving because of the nontax financial benefits that they provided. The record establishes decades of fighting among the brothers including over ownership and inheritance of Interstate. These are not simply theoretical justifications and were established by

[*79] the witnesses' credible testimony. Respondent wants us to ignore credible testimony in favor of the initial communications among the family members, Mr. Meltzer, and Mr. McNair after the June meeting. We do not restrict our findings in such a manner.

The brothers, acting as the cotrustees of the CMM trust, sought to ensure that Mrs. Morrissette's wishes with respect to the future ownership of Interstate were met to the extent practical given business realities and family dynamics. The changes made as part of the 2006 plan went against Mrs. Morrissette's wishes, not only by allowing the sale of a brother's stock after his death but also by allowing adopted children and spouses to inherit Interstate stock. Under the 1996 plan, each brother also had a general power of appointment over the assets in his AEM subtrust which he could use to distribute assets in a manner that went against the parents' wishes. Another flaw with that plan.

The fact that the changes made by the 2006 plan were inconsistent with Mr. and Mrs. Morrissette's wishes does not cause us to find a lack of a significant, legitimate nontax purpose. The brothers did their best to honor their parents' wishes. On the basis of the above facts and the family members' credible

[*80] testimony, we find a legitimate, nontax purpose.[8] Ken credibly testified at trial that he would have had the CMM trust enter the split-dollar arrangements even if there had been no tax saving.

We dismiss respondent's arguments to the contrary. Respondent speculates that Mrs. Morrissette disapproved of the 2006 plan and was unwilling to pay the premiums, which is the reason the brothers had a conservator appointed. The facts in the record do not support that presumption. The circuit court appointing the conservator determined that Mrs. Morrissette was incapable of making financial decisions. Credible testimony establishes that the brothers decided to use a conservator to protect against future legal disputes over the 2006 plan and to protect against one brother's backing out of the plan at the last minute.

Respondent argues that the brothers stood on both sides of the split-dollar agreements. A taxpayer's standing on both sides of a transaction can indicate there is no legitimate, nontax purpose for the transfer. Estate of Hillgren v. Commissioner, T.C. Memo. 2004-46. Intrafamily transactions often involve a party's standing on both sides of the transactions, but such transactions can still

---

[8]Respondent contends that Ken and Don made statements inconsistent with their trial testimony during informal interviews. Upon our review of interview transcripts, trial testimony, and the documents in the record, we find the brothers' trial testimony credible. We do not agree that Ken and Don made inconsistent statements during the interviews.

[*81] satisfy the bona fide sale exception. Estate of Thompson v. Commissioner, 382 F.3d at 382. An intrafamily transfer requires heightened scrutiny to ensure that the transfer is not a sham or a disguised gift but does not foreclose the existence of a bona fide sale. Estate of Bongard v. Commissioner, 124 T.C. at 119. For an intrafamily transfer, even the absence of negotiations is not a compelling factor when other objective factors establish the bona fides of the transaction. Kimbell, 371 F.3d at 263. The brothers' presence on both sides of the split-dollar agreements does not change our factual determination of a bona fide transfer particularly in the light of the brothers' contentious relationship, which sometimes might have been more accurately described as hostile. It is likely that at least one brother would have objected to anything that another brother proposed even if it was in the objecting brother's best interest or a brother would object just to spite his brothers. See Estate of Stone v. Commissioner, T.C. Memo. 2003-309 (holding that resolving intrafamily disputes that had led to litigation in the past is a legitimate, nontax purpose).

More problematic is the distribution of the split-dollar agreements to the counterparty to the agreement. After that time, the brothers had complete control over the policies and could cancel them at any time although Ken credibly testified that he did not intend to do so. Respondent argues that the brothers understood

[*82] that the dynasty trusts would inherit the split-dollar rights and the brothers would have complete control over the policies to surrender them at any time. We disagree for two reasons. The CMM trust agreement gave to the brothers as cotrustees the discretion to distribute each split-dollar agreement, and, given their relationships, distribution was not guaranteed. More importantly, the effects of the possible distribution of the split-dollar agreements after Mrs. Morrissette's death are more relevant to our determination of the fair market value of the split-dollar rights on the valuation date and not whether the transfers qualified as bona fide sales. The brothers also understood their future obligations under the buy-sell provision, and Ken and Don credibly testified that there was no prearranged plan to terminate the split-dollar agreements upon their mother's death.

Respondent also argues that the type of life insurance policies purchased, ones with high initial cash values and modest death benefits, is proof of the tax motivations of the split-dollar agreements. He argues that the high initial cash surrender values removed more assets from the gross estate. However, the brothers credibly explained the reasons they choose policies with high initial cash surrender values. They wanted to ensure that the CMM trust would be adequately compensated for financing the premiums from the outset, i.e., that the CMM trust would earn interest for funding the premiums through inside buildup.

[*83] Respondent also argues that the fact that Buddy's children retained his stock after his death establishes that the buy-sell provision was not a legitimate reason for the CMM trust's transfer of the premiums. He also cites the fact that the insurance proceeds were redistributed equally among the three dynasty trusts. But the buy-sell provision had substance. It makes sense that Bud and J.D. wanted to retain their father's voting stock as they worked at Interstate. They wanted the 2006 plan to protect their careers at Interstate. Even though they chose not to sell when their father died, the buy-sell provision and the split-dollar agreements protected them by giving them a chance to buy their uncles' stock. Moreover, respondent ignores Buddy's cashout of his nonvoting stock before Mrs. Morrissette died, making a buyout after his death less important from a financial standpoint.

Finally, respondent argues that the Van Lines loan used to pay the premiums is evidence that the split-dollar agreements were tax motivated. He speculates that the loan was not repaid and questions the CMM trust's ability to repay it. We agree with petitioners that the issue of nonpayment is a new issue raised on brief and is not properly before the Court.[9] A party may not raise a new issue on brief

---

[9]Respondent also argues that the estate's reporting of the loan effectively reduced the reported value of the split-dollar rights by the loan amount for a net

(continued...)

[*84] where consideration of the issue would surprise or prejudice the opposing party. Smalley v. Commissioner, 116 T.C. 450, 456 (2001). Furthermore, the loan was secured, and interest was charged and paid. The loan was treated as an advance of Interstate's shareholder distribution and was used to fund a small portion of the total premiums. The CMM trust had assets sufficient to repay the loan at its maturity apart from the insurance proceeds. The estate reported the loan, which was due after Mrs. Morrissette's death, as a liability. Upon distribution of the split-dollar rights, the dynasty trusts executed notes to Van Lines. Under the totality of the facts, use of the loan does not preclude a finding of legitimate, nontax purposes.

Taking into account the totality of the facts and circumstances, the CMM trust had legitimate and significant nontax purposes for entering into the split-dollar agreements and funding payment of the premiums in exchange for repayment plus interest in the form of inside buildup. An important purpose of the transfer was to promote the management succession and efficiency and to protect

---

[9](...continued)
value of $3.3 million for the split-dollar rights. The netting argument is also a new issue not properly before the Court. We cannot evaluate respondent's netting argument unless petitioners had the opportunity to address relevant evidence such as whether the loan was reported as an asset of Interstate that would increase Interstate's value and the value of the gross estate.

[*85] corporate profits for the accumulation of capital to develop the business. On the basis of the record before us, we find that unrelated parties would have agreed to similar terms. Respondent has not argued otherwise.

2.      Adequate and Full Consideration

To qualify for the bona fide sale exceptions, the transfer must have been made for adequate and full consideration in money or money's worth. Secs. 20.2036-1(a), 20.2038-1(a), Estate Tax Regs. Adequate and full consideration for purposes of sections 2036 and 2038 requires an exchange of a roughly equivalent value that does not deplete the estate. Estate of Bongard v. Commissioner, 124 T.C. at 119; see also Kimbell, 371 F.3d at 262, 265 (describing adequate and full consideration as an exchange of a "commensurate (monetary) amount" that "does not deplete the estate"); Wheeler v. United States, 116 F.3d 744, 759 (5th Cir. 1997) (stating adequate and full consideration requires that the sale not deplete the gross estate). Petitioners have the burden to prove that the CMM trust received adequate and full consideration upon the execution of the split-dollar agreements. See Estate of Bongard v. Commissioner, 124 T.C. at 118.

a.      Economic Benefit Regime

Before addressing whether the CMM trust received adequate and full consideration, we first address petitioners' argument that satisfaction of the

[*86] economic benefit regime means that there was adequate and full consideration. Petitioners argue that estate tax consequences of the split-dollar agreements should be consistent with the economic benefit regime. The CMM trust's payment of the premiums was not a gift for gift tax purposes, which means, according to petitioners, the transfer was an exchange for adequate and full consideration.

Compliance with the economic benefit regime does not mean that the adequate and full consideration requirement is met. Estate of Cahill v. Commissioner, at *33. Under the plain text of the regulations, the economic benefit regime does not apply for estate tax purposes. The regime is set out in the income tax regulations, and the regulations state that the regime applies for income, gift, employment, and self-employment tax purposes. Sec. 1.61-22(a), Income Tax Regs. Estate tax is not listed. The economic benefit regime does not use the phrase "adequate and full consideration" or otherwise invoke the concept of adequate and full consideration. Rather, it addresses a separate fundamental question of gift tax, whether there is a completed transfer. See sec. 2512 (requiring a completed transfer of property to impose gift tax). The economic benefit regime does not require a comparison of the amount of the premium payment with the value of the rights that the CMM trust received in exchange.

**[\*87]** Accordingly, petitioners cannot rely on the economic benefit regime to establish that the CMM trust received adequate and full consideration.

> b.     Definition of Adequate and Full Consideration

Respondent argues that adequate and full consideration is determined on the basis of a willing buyer and a willing seller who are hypothetical persons dedicated to achieving maximum economic advantage. See Estate of Bright v. United States, 658 F.2d 999, 1005-1006 (5th Cir. 1981) (describing a willing buyer and a willing seller as hypothetical persons); Estate of Davis v. Commissioner, 110 T.C. 530, 535 (1998). He argues, and may be correct, that a hypothetical investor would demand a higher return than the CMM trust to account for the split-dollar agreement's lack of marketability and the risk associated with the brothers' unknown health or the uncertainty of their life expectancies. The CMM trust would discount such factors especially as we find, on the basis of the brothers' credible testimony, that the brothers' dynasty trusts and the CMM trust intended to retain the split-dollar agreements.

The adequacy of consideration is not defined on the basis of a willing buyer and willing seller and is not judged from the perspective of hypothetical persons. See Kimbell, 371 F.3d at 266. Rather, such concepts are part of the definition of fair market value. Id. Fair market value is the price at which property would

**[\*88]** change hands between a willing buyer and a willing seller, neither being under any compulsion to buy or to sell and both having reasonable knowledge of the relevant facts. United States v. Cartwright, 411 U.S. 546, 551 (1973); sec. 20.2031-1(b), Estate Tax Regs.

The bona fide sale exception does not require an arm's-length transaction, and an intrafamily transfer can constitute a bona fide sale. Estate of Bongard v. Commissioner, 124 T.C. at 122-123; see secs. 2036, 2038; secs. 20.2036-1(a), 20.2038-1(a), Estate Tax Regs.; see also Estate of Thompson v. Commissioner, 382 F.3d at 382-383. However, intrafamily transfers require heightened scrutiny. Estate of Bongard v. Commissioner, 124 T.C. at 122-123; see also Estate of Thompson v. Commissioner, 382 F.3d at 382-383; Kimbell, 371 F.2d at 262-263. Adequacy of consideration is ascertained on the basis of what would occur in an arm's-length transaction. Estate of Bongard v. Commissioner, 124 T.C. at 122-123. We consider whether "the terms of transaction differed from those of two unrelated parties negotiating at arm's length." Id. at 123.

Respondent inappropriately conflates the definition of adequate and full consideration with that of fair market value. To the extent that respondent argues that adequate and full consideration should be defined as fair market value for purposes of this case, we disagree. Respondent contends without any support in

**[*89]** the record that Mrs. Morrissette's unwillingness to enter into the split-dollar agreements is the reason the brothers sought the appointment of the conservator. The brothers credibly testified that they sought the appointment because of the past conflict among the brothers.

The parties' experts agree that an investor may make investment choices for reasons other than maximizing financial return. In <u>Kimbell</u>, 371 F.3d at 265-266, the Court of Appeals for the Fifth Circuit recognized that there was "nothing inconsistent" with acknowledging that an investor received a partnership interest for adequate and full consideration and the partnership interest had a substantially lower fair market value than the assets contributed to the partnership (a 50% discount in that case).[10] The court described the exchange as "a classic informed trade-off." <u>Id.</u> at 266; <u>see</u> <u>Estate of Thompson v. Commissioner</u>, 382 F.3d at 381 (recognizing that the discounted value of the partnership interest does not automatically constitute inadequate consideration). It stated that the exchange involved financial considerations other than the transferor's ability to immediately sell the newly acquired assets "for 100 cents on the dollar." <u>Kimbell</u>, 371 F.3d

---

[10]Petitioners incorrectly argue that <u>Kimbell</u> rejected the roughly equivalent test when the transferor receives financial benefits other than the purchase price. The court in <u>Kimbell</u> recognized the roughly equivalent test. None of the Court of Appeals cases cited by petitioners expressly rejected the roughly equivalent test.

**[*90]** at 266. It noted that investors who make such an investment do so for benefits such as management expertise, security or preservation of assets, and capital appreciation. Id. Petitioners refer to these financial benefits as intangible benefits.

As discussed above with respect to the legitimate, nontax purposes of the split-dollar agreements, the split-dollar agreements provided financial benefits other than the ability to immediately sell the split-dollar rights or to collect on the split-dollar rights, i.e., repayment plus inside buildup, such as management succession and efficiency and capital accumulation. The split-dollar agreements as part of the 2006 plan provided incentives for Bud and J.D. to remain at Interstate. Overall, the 2006 plan protected against foreseeable risks to Interstate's business.

An underlying problem of respondent's case is that he did not provide expert testimony on the value of the split-dollar rights on the transfer date except for a rebuttal of Mr. Stephanson's investment value, described infra.[11] He argued

---

[11]Mr. Stephanson determined a discount rate of 4.54% for the investment value on the basis of yields on tax-exempt municipal bonds. Respondent argues that the death benefits would have been taxed when paid to the CMM trust because it was not a beneficiary of the policies. Petitioners argue that it was a beneficiary. Mr. Burns' rebuttal changed only the tax treatment of the death benefits, increased the discount rate to 6.1% to account for the tax, and determined

(continued...)

**[\*91]** that consideration should be based on a fair market value standard but did not provide expert testimony on the split-dollar rights' fair market value on the transfer date. Instead, he argues that the value that the estate reported for the split-dollar rights approximately three years later establishes that the CMM trust did not receive adequate and full consideration. We agree with respondent that a rational investor would not give up approximately $23 million in value to achieve the nontax purposes achieved through the split-dollar agreements. However, we do not rely on the estate's reported value to determine the amount of consideration in the bargained-for exchange on the transfer date and do not agree that the claimed value is the fair market value of the split-dollar rights.

We measure the adequacy of consideration on the transfer date, not the decedent's death date. Estate of D'Ambrosio v. Commissioner, 101 F.3d 309, 313 (3d Cir. 1996), rev'g 105 T.C. 252 (1995). As the Court of Appeals for the Third Circuit there observed:

---

[11](...continued)
an investment value of approximately $21.2 million. We do not need to determine either whether the CMM trust was a beneficiary or the correct tax treatment of a payout of death benefits to the CMM trust because we do not adopt the investment value. Nor is it necessary to address respondent's alternative argument that the opined investment value, $27 million, is not roughly equivalent to the $30 million in premium payments.

[*92] There is no way to know <u>ex ante</u> what the value of an asset will be at the death of a testator; although the date of death can be estimated through the use of actuarial tables, the actual appreciation of the property is unknowable * * * . Consequently, there is no way to ever be certain in advance whether the consideration is adequate and thus no way to know what tax treatment a transfer will receive. * * *

<u>Id.</u>

We first consider whether the CMM trust received adequate and full consideration as part of a bona fide sale on the transfer date and, if it did, we then decide the fair market values of the split-dollar rights on the valuation date.

When we examine intervening events between the transfer date and the valuation date, which were significant, it is clear that the fair market values were not the same on the two dates. Don credibly testified that although Mrs. Morrissette had been diagnosed with Alzheimer's disease the previous year, she was in good health. Ken was diagnosed with terminal cancer and was no longer insurable. We would be remiss not to at least acknowledge that Mrs. Morrissette could have outlived any one of her sons. The split-dollar agreements were a safe investment with an adequate interest rate.

### c. Investment Value Standard

Petitioners presented an investment value of $27 million as a measure of adequate and full consideration. Investment value measures value on the basis of

[*93] the perspective of the individual investor and thus differs from fair market value, which relies on the perspective of hypothetical persons. Petitioners argue that we should consider Mrs. Morrissette's unique investment goals and individual circumstances when determining whether she received adequate and full consideration. To support this proposition, petitioners cite caselaw, including Kimbell, holding that adequate and full consideration is not determined on the basis of the willing buyer and willing seller standard.

Kimbell recognizes that an intrafamily transfer does not automatically disqualify a transfer from the bona fide sale exception. To this end, Kimbell and our caselaw establish an arm's-length standard. The adequate and full consideration requirement is met where the exchange is on terms similar to those that would occur in an arm's-length transaction. Estate of Bongard v. Commissioner, 124 T.C. at 122-123.

As the experts testified, a transferor for adequate and full consideration may have financial considerations other than obtaining the highest price. See Kimbell, 371 F.3d at 266. Such financial considerations are measurable by objective evidence without the need to adopt a value from Mrs. Morrissette's perspective. Accordingly, we do not adopt the investment value offered by Mr. Stephanson.

**[*94]** d. Adequacy of the Consideration

We hold that the CMM trust received adequate and full consideration on the basis of the split-dollar agreements' repayment terms that included interest earned in the form of inside buildup of the insurance policies. The minimum interest rates and the actual appreciation in the policies' cash values were higher than the interest rates that the CMM trust had been earning on the money. Respondent does not argue that the repayment terms were inadequate. The split-dollar agreements also provide the additional benefit of deferral of tax on the policies' inside buildup and the tax-exempt payout of the death benefits to the beneficiaries.

Respondent argues that Estate of Cahill involved "essentially the exact same circumstances". In that case, the decedent, at age 90, obtained a five-year bank loan to pay the entire amount of the $10 million in premiums. Here we have a 75-year-old family business and a decedent with assets sufficient to pay a substantial portion of the premiums. Here also, the decedent owned assets and other sources of income to repay the small loan she did obtain.

In addition, Estate of Cahill did not involve active business operations with related financial considerations such as management efficiency and succession, capital accumulation and long-held grudges that put those financial considerations at risk. The split-dollar agreements provided financial benefits similar to those

[*95] present in <u>Kimbell</u> including management expertise, security and preservation of assets, and capital appreciation. <u>Kimbell</u>, 371 F.3d at 266. <u>Kimbell</u> accepted theses types of financial benefits as reducible to a money value.

The CMM trust and Mrs. Morrissette received financial benefits from the split-dollar agreements including retained family control over Interstate, a smooth management succession, organizational stability, and protection of Interstate's capital by providing a source of funding to pay estate tax on the brothers' deaths. Mrs. Morrissette placed a high value on keeping Interstate within the family. The financial benefits were significant and are relevant to ascertaining the consideration received. <u>Kimbell</u> accepted similar benefits without quantifying them. <u>Id.</u> at 266-267 (finding that partnership interest discounted at 50% of the value of the assets contributed to the partnership was adequate and full consideration without quantifying the value of the other financial benefits present).

Finally, respondent argues that the aggregate reported value of $7.5 million demonstrated the lack of adequate and full consideration. We do not rely on the reported values of the split-dollar rights to determine the amount of the consideration received and, for the reasons stated below, find that the estate substantially undervalued the split-dollar rights for reporting purposes. With the

**[\*96]** expert testimony, there is no need for us to rely on the reported value three years after the transfer date to ascertain the adequacy of the consideration.

Estate tax saving was not achieved through execution of the split-dollar agreements alone but rather through the undervaluation of the split-dollar rights. In exchange for $30 million, the dynasty trusts agreed to purchase life insurance and repay the CMM trust. The transactions created contract rights, and Mrs. Morrissette retained the contract rights during her lifetime and held them at the time of her death. She no longer had use of or access to the $30 million. The split-dollar agreements changed the nature of the CMM trust's relationship with the funds it transferred. See Estate of Thompson v. Commissioner, 382 F.3d at 377 (finding the decedent's relationship to the transferred assets remained the same after the transfer).

B.      Section 2703 Special Valuation Rule

The first step in the valuation process is to determine the property includible in the gross estate. The parties agree that the split-dollar rights are assets that are includible in the gross estate. The estate included the split-dollar rights in the gross estate but reported values for the rights substantially discounted from the $30 million in premiums that the CMM trust paid. By doing so, the estate significantly undervalued the split-dollar rights.

[*97] Before we determine the fair market values of the split-dollar rights, we must consider application of the special valuation rules of section 2703. Section 2703(a) provides that the value of any asset includible in the gross estate shall be determined without regard to (1) any option, agreement, or other right to acquire or use the property at a price less than its fair market value or (2) any restriction on the right to sell or use such property. Section 2703(b) provides an exception where the restriction is a bona fide business arrangement, not a device to transfer property to members of the decedent's family for less than adequate and full consideration, and comparable to the terms of similar arrangements in arm's-length transactions.

The parties filed cross-motions for partial summary judgment with respect to the application of section 2703(a). We denied both motions in an order dated February 19, 2019, citing Estate of Cahill v. Commissioner, at *28. We held that section 2703(a) would apply to disregard the mutual termination restriction unless the section 2703(b) exception is satisfied.[12]

---

[12]Respondent contends that once we disregard the mutual termination restriction, the split-dollar rights would have values equal to the cash surrender values. Because the sec. 2703(b) exception applies, we do not need to determine the values of the split-dollar rights under the assumption of a unilateral termination right.

[*98] Petitioners have established that the section 2703(b) exception applies in this case. Under the exception, the restriction must be part of a bona fide business arrangement, not a device to transfer property at less than adequate and full consideration, and for terms comparable to similar arrangements entered into at arm's length. Sec. 2703(b); sec. 25.2703-1(b)(4), Gift Tax Regs.

1.     Bona Fide Business Arrangement

A bona fide business arrangement is not defined in the Code or the regulations. Sec. 2703(b)(1). We have held that a restrictive arrangement must further some business purpose. Amlie v. Commissioner, T.C. Memo. 2006-76. As discussed above, the family members credibly testified that the split-dollar agreements were entered into for valid business purposes and the mutual termination restriction was added so that no brother could jeopardize the valid business purposes of the agreements. The split-dollar agreements were intended to address flaws in the 1996 plan, past disputes, and Interstate's future management while attempting to accomplish Mrs. Morrissette's wish for the company remain within her family for generations. See Estate of Gloeckner v. Commissioner, 152 F.3d 208, 214 (2d Cir. 1998), rev'g on other grounds T.C. Memo. 1996-148; Kress v. United States, 382 F. Supp. 3d 820, 839 (E.D. Wis. 2019) (recognizing

**[*99]** maintenance of family ownership and control of a business as a valid business purpose).

The family members credibly testified about the difficulties created within Interstate's management and for its employees. Ken credibly testified that he would have engaged in the split-dollar agreements even if they had not provided any estate tax saving. It is not clear that the brothers would have agreed to terminate the split-dollar agreements during Mrs. Morrissette's life so that the CMM trust would receive repayment. Assuming that the split-dollar agreements are viewed as written, the dynasty trusts would receive nothing upon a termination of the split-dollar agreements.

Furthermore, the CMM trust had valid business reasons for entering into the split-dollar agreements. Planning for future liquidity needs of a decedent's estate constitutes a business purpose under section 2703(b)(1). Amlie v. Commissioner, T.C. Memo. 2006-76. We find that the mutual termination restriction furthered the business purposes of the split-dollar agreements and had a significant effect in supporting those business purposes.

2.    Testamentary Device

Under the second prong of the exception, the restriction must not be a device to transfer property for less than adequate and full consideration in money

[*100] or money's worth. Sec. 2703(b)(2). Some facts indicate a testamentary purpose of the split-dollar agreements. However, under the second prong of the exception, we consider whether the mutual termination restriction is a device, not whether the split-dollar agreements in their entirety were a device. Whether a restriction constitutes a testamentary device depends in part on the fairness of the consideration received by the transferor when it executed the transaction. See Estate of True v. Commissioner, T.C. Memo. 2001-167, aff'd, 390 F.3d 1210 (10th Cir. 2004). Respondent does not seek to disregard the split-dollar agreements in their entirety.

Under the totality of the facts and circumstances, we find that the mutual termination restriction was not a device to transfer funds at less than adequate and full consideration. As discussed above, the split-dollar agreements contained repayment terms that a reasonable investor would have accepted. They provided inside buildup at a guaranteed interest rate of 3% and in fact provided interest between 4.75% and 5.4%, higher than the CMM trust had been earning on the transferred funds. The inside buildup appreciated at rates comparable to those of long-term bonds. The split-dollar agreements were stable investments that also provided for tax deferral on the inside buildup. Petitioners argue that the inside buildup would have been tax exempt although we do not decide that question.

[*101] Each of these facts negates a finding that the mutual termination restriction was a device to transfer property for less than adequate and full consideration.

The gift tax treatment of the split-dollar agreements does not change our conclusion that split-dollar agreements entered into at arm's length between unrelated parties would contain a mutual termination restriction comparable to the one at issue here. To do otherwise, we would need to ignore the insureds were also senior executives in a successful 75-year-old business who had not only run the company for nearly 40 years but also significantly developed it.

For reasons stated above with respect to the section 2036 and 2038 exceptions, the CMM Trust received other financial benefits from the premium payments. The CMM trust received value through continued family control and management succession and avoidance of uncertainty including possible future litigation. The turmoil among the family members who served as senior management executives exposed the fair market value of Interstate to risk that a prudent investor would have considered. Buddy, who was Interstate's CEO, had sought a buyout for years, and the split-dollar agreements provided for one. In respondent's view, the CMM trust benefited only because of estate tax saving. This is clearly not the case, on the basis of the record. The CMM trust received adequate and full consideration when it executed the split-dollar agreements. The

**[*102]** CMM trust relinquished rights over the transferred amounts for additional certainty about Interstate's future.

Petitioners argue that the split-dollar agreements were not devices to evade tax because the net death rights were transferred in accordance with the split-dollar regulations. Compliance with the regulations does not itself establish that the split-dollar agreements were not a device to evade tax. See Estate of Cahill v. Commissioner, T.C. Memo. 2018-84. First, we note that the exception focuses not on the restriction as part of a bona fide business arrangement and not on the split-dollar agreements as a whole. Irrespective of the statutory or regulatory wording, the fact that the split-dollar agreements reduced the estate tax on Mrs. Morrissette's estate does not require a finding that the agreements were testamentary devices. The CMM trust through its cotrustees did not enter into the split-dollar agreements with an intent to evade estate tax. The cotrustees believed the terms to be fair at the time the CMM trust executed the split-dollar agreements including the mutual termination restriction. Accordingly, the mutual termination restriction satisfies the second requirement of the exception.

[*103] 3.    Comparability With Arm's-Length Transactions

The comparability prong requires that the restriction would have been part of an arm's-length transaction between unrelated parties.  Sec. 2703(b)(3); sec. 25.2703-1(b)(4)(i), Gift Tax Regs.  Thus, the issue for the third prong of the section 2703 exception is whether unrelated parties in an arm's-length transaction would include a mutual termination restriction in a split-dollar agreement that is comparable to the mutual termination restriction at issue.

The regulations instruct that the restriction must be comparable to one struck in a fair bargain among unrelated parties in the same business and that such a bargain occurs when it conforms with the general practices of negotiated agreements in that same business.  Sec. 25.2703-1(b)(4)(i), Gift Tax Regs.  The regulations caution against using "isolated comparables".  Id. subdiv. (ii).  We have described the third prong of the exception as "more of a safe harbor than an absolute requirement that multiple comparables be shown."  Amlie v. Commissioner, T.C. Memo. 2006-76, slip op. at 41.

Respondent offered split-dollar agreements entered into as employee compensation by publicly traded corporations.  Public corporations do not necessarily meet the regulations' directive to consider the same business.  Mr. Burns did not provide an analysis of the business of the public corporations or

**[\*104]** whether any were in the same business as Interstate. The fact that the corporations were public alone causes us to question whether we should rely on the agreements as comparable. Interstate has been a family business for over 75 years. Split-dollar agreements entered into by public corporations have little relevance to ascertaining whether a closely held corporation or its majority shareholder would include a mutual termination restriction in a split-dollar agreement. In 2006 Mrs. Morrissette owned 75% of Interstate directly or indirectly.

However, this is not the only problem that we have with the corporate filings. On respondent's instruction, Mr. Burns limited his review to policies owned by the employer. Here, Interstate did not own the policies and did not have any ownership rights to the policies. The dynasty trusts owned the policies, and the split-dollar agreements placed restrictions on their ownership rights. They did not convey any ownership rights in the policies to the CMM trust. The fact that the economic benefit regime deems the CMM trust the policy owner for gift or income tax purposes is irrelevant. We consider the agreements as written just as Mr. Burns considered the public split-dollar agreements as written. Respondent has not articulated a convincing reason for placing such a restriction on Mr. Burns' testimony.

**[*105]** Finally, we do not agree with Mr. Burns' characterization that 84% of the reviewed agreements provide a unilateral termination right to the employer or gave the employer full unilateral access to the cash surrender values. Twenty-six agreements provided some type of restriction of the employers' rights to unilaterally terminate the split-dollar agreements. Vesting for years of service is one such restriction which is particularly relevant here given the fact that the brothers were senior executives. Petitioners ask us to consider whether a closely held corporation would provide life insurance benefits to its senior executives who had worked within the business for over 40 years. Such consideration is appropriate. Long-term senior executives would likely demand a mutual termination restriction comparable to the one at issue, and the reviewed agreements provide vesting provisions. The mutual termination restriction would ensure the executives' rights to the net death benefits similar to vesting in employment compensation packages on the basis of years of service. In total, approximately 30% of the public agreements imposed some restriction on the employer's termination rights. The termination rights of another 13% are not as clear as respondent argues.

As discussed above, on these facts we hold the split-dollar agreements were entered into at arm's length especially in the light of the brothers' acrimonious

[*106] relationships and disputes over Interstate's ownership. We are satisfied that a split-dollar agreement entered into by a closely held business and its long-term senior executives at arm's length may contain a mutual termination restriction similar to the one in the split-dollar agreements at issue. Accordingly, we hold that the third requirement of the section 2703(b)(3) exception has been met.

On this record, we conclude that the requirements of the section 2703(b) exception are satisfied and section 2703 does not require disregard of the mutual termination restriction for purposes of determining the fair market values of the split-dollar rights.

C.    Fair Market Value

For the reasons stated above, resolution of this case requires a determination of the fair market values of the split-dollar rights. There are two differences in the experts' computations: computation of the probability-adjusted expected values of the policies and of the applicable discount rates to determine the present value of those expected returns. The latter difference is the reason for substantially all of the differences in the experts' opined fair market values. We address each difference separately.

**[*107]** 1.    Probability-Adjusted Expected Value

Each expert determined a probability-adjusted expected value for each year of the brothers' life expectancies by estimating an expected cash surrender value for each year and multiplying that value by the brothers' probabilities of mortality that year.  The experts differed on both factors.

a.    Expected Cash Surrender Values

Mr. Stephanson's and Mr. Burns' expected cash surrender values differed slightly.  Dr. Khetan's values differed more significantly.  Respondent concedes that Mr. Stephanson's calculations are reasonable but objects to Dr. Khetan's computations.  Respondent argues that Dr. Khetan's blended yield inappropriately decreases the expected cash surrender values, making his computations unreliable.

A second concern with Dr. Khetan's expected cash surrender values is that he did not use policy illustration yields that were issued closest in time to the valuation date.  Typically, we consider information available on or closest in time to the valuation date and facts that were reasonably known on the valuation date. Estate of Gilford v. Commissioner, 88 T.C. 38, 52-53 (1987).  Generally, valuations based on subsequent events that were not foreseeable on the valuation date are not helpful.  Messing v. Commissioner, 48 T.C. 502, 509 (1967).

[*108] On the basis of these two objections, we do not rely on Dr. Khetan's expected cash surrender values. We agree with Mr. Burns' testimony that the blended yield inappropriately lowers the expected cash surrender values over the course of the brothers' life expectancies. While an investor might consider the minimum interest rate, use of the blended yield places too much weight on the actual yields' decreasing. Policy illustration yields are merely projections, and Dr. Khetan did not analyze how policy illustration yields differed from actual yields. On the record, we cannot predict whether actual yields would increase or decrease after the valuation date. Moreover, we account for uncertainty in connection with an investment in the split-dollar rights through the discount rate. Use of the blended yield decreased Dr. Khetan's opined fair market values by $1.3 million.

   b. <u>Probability of Mortality</u>

  Both Mr. Stephanson and Dr. Khetan used the IRS mortality table for the probabilities of mortality. Respondent concedes that it is appropriate to use the IRS table. See <u>Estate of Van Horne v. Commissioner</u>, 720 F.2d 1114, 1116 (9th Cir. 1983) (recognizing that IRS actuarial tables are favored in part because they "provide a needed degree of certainty and administrative convenience in ascertaining property values" (quoting <u>Bank of Cal. v. United States</u>, 672 F.2d 758, 760 (9th Cir. 1982))), <u>aff'g</u> 78 T.C. 728 (1982). Mr. Burns' mortality

[*109] probabilities seem to produce a more favorable valuation for the estate, although minimally, than the IRS mortality table. To the extent that Mr. Burns' probabilities are more favorable for the estate, we treat his mortality statistics as a concession by respondent.

2. Discount Rate

On the basis of the expert testimony, we accept Mr. Burns' discount rates of 8.85% and 6.4%, for American General and MassMutual, respectively, as the most accurate indications of the present values of the split-dollar rights on the valuation date. Mr. Burns testified that the investment portfolios and debt reflect the risk that the insurers would default on their payment obligations under the policies. On the basis of Mr. Burns' reliance on the insurance companies' returns on their investment portfolios and company-specific debt of different credit quality, he determined a different discount rate for each insurance company.

a. Base Range

Mr. Burns set the parameters for the base ranges as the Burns yields and company-specific debt yields. The Burns yields were 6.44% to 6.76% for American General and 5.5% to 5.74% for MassMutual. Mr. Burns used 6.8% and 5.7% for the lower ends of the ranges. The Burns yields are lower than the average historic yields for both insurance companies, 8% and 6.7% for American

[*110] General and MassMutual, respectively, because of the use in his computation of the spot yields for U.S. Treasury bonds on the valuation date, a time when the interest rates were at a 50-year low. We find it appropriate to consider historic yields to determine the discount rate. We rely primarily on Mr. Burns' analysis of the historic yields as the most reliable indicator of the discount rate. His methodology considered the spot yields on U.S. Treasury bonds, which capture the market conditions on the valuation date.

Mr. Burns relied on company-specific debt yields for the high end of his base range. The split-dollar agreements involve a degree of uncertainty in the timing of the payout that is not present with corporate debt, but the timing is not highly speculative as petitioners argue. Mortality statistics lessen the degree of uncertainty. Mr. Burns relied on industry debt with holding periods similar to the brothers' life expectancies. We find use of the company-specific debt yields appropriate and a reliable indicator of the discount rate.

For MassMutual, company-specific debt YTM, 7.1%, is supported by industry debt yields from Bloomberg, 5.54% to 6.12%, and the average and median YTM from the Reuters Thomson market data on public A rated bonds. Although industry (Reuters Thomson) YTM on public A rated bonds had a large range, 5.54% to 11.86%, the median YTM was 6.72%, and the average YTM was

**[\*111]** 7.69%. It is unclear from the record whether the Bloomberg data contains offering yields or YTM. YTM better reflects market conditions on the valuation date and allows investors to better evaluate an investment than do offering yields. The A rated industry debt was of lower credit quality, which would support higher yields, than MassMutual's debt. Other factors, such as fixed maturity dates and periodic income distributions, make industry debt less risky than the split-dollar agreements. Additionally, complexity of the split-dollar agreements and the lack of an organized market add a degree of risk not present with industry bonds. Such risks are accounted for with the liquidity premium, not in the base range. Policy obligations take priority over unsecured debts, and the base discount rate should not be higher than YTM on company-specific unsecured debt. After consideration of all these factors, we find that a base range ending at 7.1% is reasonable for MassMutual.

For American General, Mr. Burns' use of AIG's debt yields was conservative and beneficial to the estate especially in the light of the significantly lower yields on industry debt. AIG's debt had YTM from 9.6% to 10.9%, significantly higher than both industry (Bloomberg) yields for A and BBB rated debt, 5.54% and 6.12%, respectively, and industry (Thomson Reuters) average and median YTM for A rated public and private bonds, 7.92% and 7.81%,

[*112] respectively, and BBB rated bonds, 8.53% and 8.42%, respectively. AIG Life's two public bonds also had YTM significantly higher than industry debt, 8.92% and 11.86%. AIG debt is not a perfect indicator of American General's default risk on its policy obligations. Both American General and AIG Life may have been negatively affected by AIG's bankruptcy. However, American General had no financial obligations with respect to AIG's debt. On the basis of his testimony, Mr. Burns could have supported a lower base range than the 10.9% high end that he determined for American General. His determination is reasonable.

### b. Liquidity Premium

The parties' experts agree that the fair market values of the split-dollar rights should be discounted for a lack of marketability. Mr. Burns determined a liquidity premium by comparing the average YTM on private bonds and all bonds (public and private combined) from Thomson Reuters market data, yield differentials of .18 and .19, respectively. He added a higher liquidity premium, .5.

Comparing private bond and all bonds does not fully account for the lack of marketability of the private bonds. We find that the relevant comparisons are average yield differentials on private versus public bonds. However, such a

**[*113]** comparison, yield differentials of .41 and .24, for A rated and BBB rated bonds, respectively, would not affect Mr. Burns' determined liquidity premium.[13]

### c. Life Settlements

Petitioners urge us to use life settlement yields as the discount rate. Mr. Stephanson cited a range of yields from 15% to 18%. Dr. Khetan determined a sizable range of 9.3% to 23.2% for the yields, settled on a 15% discount rate, near the midpoint, and cited even larger ranges in his report. Factors related to life settlements can explain the wide range of yields including the varying sizes of the underlying policies, the financial strength of the insurance companies, the insureds' medical histories, mortality assumptions, and continued obligations to pay premiums. However, we have no way of evaluating these factors as they compare with the split-dollar agreements because such information is not provided. Dr. Khetan included yields on viatical settlements which are substantially riskier than the split-dollar agreements and are not comparable investments.

---

[13]The differential in the median YTM for A rated bonds, 1.37, would support a higher liquidity premium. This differential reflects the skewed YTM for the public bonds. Given the small size of the data set (six) and our determination that Mr. Burns' base ranges and base rates are conservative, we find Mr. Burns' opined discount rates an accurate reflection of the risks associated with the split-dollar agreements and the fair market values of the split-dollar rights.

**[\*114]** Mr. Burns testified to the problems with using life settlement yields. His testimony is sound and helpful to the Court. Dr. Khetan acknowledged many of them in his report. Mr. Burns provided life settlement yields from academic and industry studies that set lower yields, 8% to 12%. Mr. Burns testified that these sources are also problematic and unreliable. On their face, life settlements are an appealing source to determine the discount rate because the return depends on the performance of a life insurance policy. Payout depends on the insured's life expectancy, and there are no periodic cash distributions. However, other characteristics of life settlements make them more risky, e.g., the obligation to pay additional premiums, the poor health of the insured, and other unknown risks such as the financial stability of the insurers, the return on their investment portfolios, and the insured's life expectancy. We do not know the circumstances under which the insureds sold their policies in life settlements. The differences between the life settlements and the split-dollar agreements make the comparison unreliable especially in the light of the lack of transparency associated with life settlement yields. Without more information, it is not possible to place the split-dollar agreements accurately within that range.

**[*115]**      d.      <u>Termination Assumption</u>

Respondent asserts that the fair market values of the split-dollar rights as determined above should be adjusted for the fact that it is likely that they will be terminated before the insureds' deaths. He argues that the brothers intended to terminate the split-dollar agreements on December 31, 2013, and we should determine the fair market values assuming a December 31, 2013, maturity date and payout of the cash surrender values. On the basis of such an assumption, Mr. Burns determined that the split-dollar rights had an aggregate fair market value of $27,857,709.

Petitioners argue that there was no prearranged plan to terminate the split-dollar agreements when the agreements were executed. We are not convinced. When the 2006 plan was implemented, the CMM trust agreement was amended to distribute the split-dollar rights to the respective dynasty trusts that owned the underlying policies. Such a distribution indicates an intent to give the dynasty trusts full control over the policies once the distribution occurred. Such control makes it appropriate to apply a maturity date, and we apply a maturity date of December 31, 2013. That is the date that respondent seeks. Accordingly, we do not apply an earlier one.

[*116]  We acknowledge that Ken testified that he did not intend to cancel the policies.  While we find him credible, the brothers were free to choose to cancel the policies after the agreements were distributed to the dynasty trusts.  From the outset, the plan was to give the dynasty trusts complete control after Mrs. Morrissette's death, and the CMM trust agreement was so amended.  Respondent points to other facts to support a December 31, 2013, maturity date including the decision to purchase policies with high premiums and modest death benefits and July 2010 emails between Don, Mr. Meltzer, and Mr. McNair that discuss the possibility of canceling certain policies.  Mr. McNair responded to Don that he insisted that the policies not be canceled until the three-year period of limitations on the estate return had expired.  This is the basis for respondent's choosing December 31, 2013, as the maturity date.  Petitioners raise valid objections to the emails including that Ken and Buddy were not involved and the discussion started out about the effect of cancellation of the policies on Mr. Meltzer's future commissions.  However, on our review of all the facts and circumstances, the key factor in setting the December 31, 2013, maturity date is the brothers' complete control over the split-dollar agreements.  As stated above, there are grounds for setting an earlier maturity date, but we will use respondent's date.

**[\*117]** 3.     Conclusion

For purposes of the calculation of the split-dollar rights' fair market value, we direct the parties to determine the annual probability-adjusted expected value for each policy on the basis of Mr. Stephanson's expected cash surrender values and Mr. Burn's probabilities of mortality to the extent such values and probabilities are more favorable to the estate than those used by Mr. Burns and IRS mortality tables.  We further direct the parties to apply discount rates of 8.85% and 6.4%, for American General and MassMutual, respectively, to the annual probability-adjusted expected values to determine the fair market values and assume a maturity date of December 31, 2013.

D.     Accuracy-Related Penalties

Respondent determined that the estate is liable for an underpayment penalty of 40% for a gross valuation misstatement or, alternatively, of 20% for a substantial estate tax valuation understatement.  Sec. 6662(a), (b)(5), (g)(1), (h).  A substantial estate tax valuation understatement exists if the value of any property claimed on an estate tax return is 65% or less of the amount determined to be the correct amount of such valuation.  Id. subsec. (g)(1).  A gross valuation misstatement exists if the value is 40% or less of the correct value.  Id. subsecs. (g)(1), (h)(2)(c).

**[*118]** Our determination of the fair market values of the split-dollar rights in accordance with the parameters listed above results in a gross valuation misstatement. Petitioners argue that they are not liable for the accuracy-related penalties on two grounds: (1) respondent's agent did not obtain prior written supervisory approval of the initial determination of the penalties required by section 6751(b)(1); and (2) the estate acted with reasonable cause and in good faith in its reporting of the fair market values of the split-dollar rights.

      1.      <u>Prior Written Supervisory Approval</u>

Section 6751(b)(1) requires the initial determination of certain penalties to be personally approved in writing by the immediate supervisor of the IRS employee who made the determination to assert the penalty. <u>Belair Woods, LLC v. Commissioner</u>, 154 T.C. 1, 7 (2020); <u>Clay v. Commissioner</u>, 152 T.C. 223, 248 (2019). Written supervisory approval must be obtained before the IRS formally communicates the penalty to the taxpayer. <u>Clay v. Commissioner</u>, 152 T.C. at 249. Section 7491(c) places a burden of production on the Commissioner with respect to the liability of any individual for any penalty. When the Commissioner has a burden under section 7491(c), that burden includes producing evidence showing compliance with the written supervisory approval requirements of section

[*119] 6751(b)(1).  See Graev v. Commissioner, 149 T.C. 485, 492-493 (2017), supplementing and overruling in part 147 T.C. 460 (2016).

An estate is not an individual, and thus the estate bears the burden of producing evidence that respondent failed to comply with the section 6751(b) requirement of written supervisory approval of penalties asserted against an estate for an estate tax deficiency.  While we note the difficulty associated with producing evidence that no evidence exists, such a difficulty does not affect this case as there is affirmative evidence in the record that establishes that respondent's agent obtained the required written supervisory approval before a formal communication of the penalties to the estate.  The record includes emails between RA Stewart and his supervisor, Ms. McCutcheon, as evidence of written supervisory approval of the penalties.  We weigh the evidence presented.

Respondent argues that the emails between RA Stewart and Ms. McCutcheon establish written supervisory approval of the penalties.  Emails may constitute written supervisory approval.  Rogers v. Commissioner, T.C. Memo. 2019-61, at *25.  Section 6751(b) does not require the approval to be in any particular form.  Palmolive Bldg. Inv'rs, LLC v. Commissioner, 152 T.C. 75, 85-86 (2019).  Nor does it explicitly require a signature; it requires the penalty be "personally approved (in writing)".  See Deyo v. United States, 296 F. App'x 157,

[*120] 159 (2d Cir. 2008) (stating section 6751(b) requires "only personal approval in writing, not any particular form of signature or even any signature at all"); Graev v. Commissioner, 149 T.C. at 488-489 & n.3 (finding a supervisor's initials were sufficient written approval).

Petitioners view the emails differently. They argue that the emails establish that Ms. McCutcheon was the IRS employee who initially determined the penalties, not RA Stewart. They argue that the civil penalty form makes clear that RA Stewart did not believe that penalties should be imposed and he did not initially determine the penalties. They argue that written approval is required from Ms. McCutcheon's supervisor.

Our review of written supervisory approval typically involves the timing of the approval and what constitutes a formal communication of the penalties to the taxpayer. Here, we are asked to judge the dynamics under which a revenue agent and his supervisor reach the conclusion to initially determine a penalty and approve that penalty determination. RA Stewart and Ms. McCutcheon initially had differing opinions as to whether it was appropriate to impose accuracy-related penalties. We can infer from the emails that RA Stewart focused on the underlying legal requirements of the split-dollar agreements and Ms. McCutcheon on the claimed values of the split-dollar rights. Their October 22, 2013,

[*121] conversation included a discussion of penalties. As a result of the discussions with his supervisor, RA Stewart agreed with the rationale Ms. McCutcheon apparently provided for imposing the penalties. We find that RA Stewart initially determined the penalties.

Ms. McCutcheon testified that she had numerous conversations with RA Stewart about this case and described him as "very concerned" about writing the RAR. She credibly testified that RA Stewart initially determined the penalties. She further testified that during the October 22, 2013, conversation she indicated her approval of the valuation penalties and asked RA Stewart to prepare a revised penalty approval form for her signature. The next day RA Stewart emailed Ms. McCutcheon to confirm his understanding that Ms. McCutcheon approved the 40% penalty. Ms. McCutcheon responded yes, and her email response is sufficient to satisfy the procedural requirements of section 6751(b) under our caselaw.

We have declined to judge the extent of the IRS employees' consideration of the penalties before initially determining or approving them. Patel v. Commissioner, T.C. Memo. 2020-133. The Commissioner is not required to demonstrate "the depth or comprehensiveness of the supervisor's review." Belair Woods, LLC v. Commissioner, 154 T.C. at 17. Likewise, we will not impose the

[*122] supervisory approval requirement in a manner that discourages frank and open dialogue between a revenue agent and his supervisor about a taxpayer's liability for a penalty. We will not examine RA Stewart and Ms. McCutcheon's discussions or RA Stewart's opinions about whether the estate should be liable for the penalties before versus after his conversation with Ms. McCutcheon. Rather, we consider the end result. Ms. McCutcheon credibly testified that RA Stewart initially determined the penalties after their October 22, 2013, conversation, and she approved the penalties in her October 23, 2013, email. Accordingly, respondent has satisfied the procedural requirements of section 6751(b).

### 2. Reasonable Cause Defense

The section 6662 penalties will not apply if the taxpayer demonstrates it acted with reasonable cause and in good faith. Sec. 6664(c)(1). Respondent argues that petitioners have waived the reasonable cause defense. We ruled in an order dated February 21, 2019, that petitioners waived reliance on legal advice as a reasonable cause defense on the basis of their claim of attorney-client and work product privileges. They did not waive the reasonable cause defense on the basis of their reliance on Mr. Stephanson's appraisal and timely asserted that defense.

We determine whether a taxpayer acted with reasonable cause and in good faith on a case-by-case basis, taking into account all pertinent facts and

[*123] circumstances. Sec. 1.6664-4(b)(1), Income Tax Regs. In general, the most important factor is the taxpayer's efforts to ascertain its tax liability. Id. Reliance on professional advice may provide a reasonable cause defense if, under all the circumstances, the reliance was reasonable and in good faith. Id.; see Neonatology Assocs., P.A. v. Commissioner, 115 T.C. 43, 98-99 (2000), aff'd, 299 F.3d 221 (3d Cir. 2002).

When considering reliance on an appraisal as a defense to a valuation penalty, we consider the methodology and assumptions underlying the appraisal, the appraised value, the circumstances under which the appraisal was obtained, and the appraiser's relationship to the taxpayer. Estate of Richmond v. Commissioner, T.C. Memo. 2014-26, at *48. In this case we place the most weight on the appraised value, less than $7.5 million. Mr. Stephanson's opined value was not reasonable, and the brothers should have known that. The brothers had the CMM trust pay $30 million and turned it into $7.5 million for estate tax reporting purposes. They should have known that the claimed value was unreasonable and not supported by the facts.

While the brothers credibly testified to the business and nontax purposes for entering into the split-dollar agreements, they also knew that Mr. Meltzer and Mr. McNair were marketing the agreements as an estate tax saving strategy. Mr.

[*124] Meltzer and Mr. McNair made it clear that the tax benefits of the split-dollar agreements would be obtained through the undervaluation of the split-dollar agreements, and the brothers knew from the time they decided to enter into the split-dollar agreements that any estate tax saving depended on valuing the split-dollar rights at a substantial discount from the premiums that the CMM trust paid. In July 2010, before the return's filing, Mr. McNair warned Don that the IRS would likely see problems with the values of the split-dollar rights that the estate had planned to report on the return. Nevertheless, the brothers had the estate report substantially discounted values on the return.

Mrs. Morrissette had significant, nontax reasons for entering into the split-dollar agreements. However, the only purpose for the substantially discounted values of the split-dollar rights as compared to the $30 million that the CMM trust paid is estate tax saving. Knowing that any estate tax saving would be from the undervaluation of the split-dollar rights, the brothers engaged an appraiser that Mr. McNair recommended. Mr. McNair reviewed a draft of Mr. Stephanson's appraisal and asked Mr. Stephanson to make changes that reduced his opined values.

Mr. Stephanson's appraisal was not reasonable, and petitioners did not rely on it in good faith. Accordingly, the estate is not entitled to rely on Mr.

[*125] Stephanson's appraisal as a reasonable cause defense. The estate did not act reasonably or in good faith in the valuation of the split-dollar rights. The estate is liable for the 40% penalty for the gross valuation misstatement of the split-dollar rights.

E.     Conclusion

In reaching our holdings herein, we have considered all arguments made, and, to the extent not mentioned above, we conclude they are moot, irrelevant, or without merit. The parties are to calculate the fair market values of the split-dollar rights in accord with the determinations we have made herein. To reflect the foregoing,

Decision will be entered under

Rule 155.